# MERCANTILE NATIONAL BANK AT DALLAS V. McCULLOUGH TOOL COMPANY.

No. A-3833. Decided April 1, 1953.
Rehearing overruled July 22, 1953.
(259 S. W. 2d Series 724)

472

*Carrington, Gowan, Johnson & Walker* and *Paul Carrington* and *Hubert D .Johnson,* all of Dallas, for petitioner.

The Court of Civil Appeals erred in holding that petitioner bank was liable to respondent tool company for breach of any agreement between the bank and the oil company for the benefit of plaintiff, since there was no evidence to support such holding; neither was there any evidence to show the occurrance of express conditions precedent to the effectiveness of any obligation of the bank to make any disbursement or payments to plaintiff. Citizens Natl. Bank v. Texas & Pac. Ry. Co., 136 Texas 333, 150 S. W. 2d 1003; Kilgore Natl. Bank v. Moore Bros. Lbr.

Co., 129 Texas 92, 102 S.W. 2d 200; F. B. Collins Inv. Co. v. Sallas, Texas Civil Appeals, 260 SW. 261.

*Fleming A. Waters,* of Cisco, and *Woodruff and Holloway,* of Brownwood, for respondents.

In rebuttal, cited Peck v. Morgan, 156 S. W. 917; Sutherland v. Citizens State Bank, 220 S.W. 115; Gulf Pipe Line Co. v. Nearen, 135 Texas 50, 138 S.W. 2d 1065.

MR. JUSTICE WILSON delivered the opinion of the Court.

This controversy determines which of two creditors shall bear a portion of the loss caused by the failure of an oil company. The determining question: May a third party action be brought upon a contract under which a bank agrees to lend money to an oil company to be disbursed to its creditors from a deposit account? The answer is "No" where (as here) the oil company has not authorized the bank to pay the specific account in a manner meeting the bank's requirements for withdrawing money from the deposit account.

The Court of Civil Appeals, 250 S.W. 2d 870, allowed the tool company a recovery against the bank.

The oil company, needing money to pay its creditors, gave the bank a note dated December 27, 1949 in the face amount of $278,000.00 secured by an oil and gas lease then owned and operated by the oil company and having at that time four producing wells and a fifth being drilled. This note required monthly installments of a minimum of $5,000.00 each with each installment to contain at least three-fourths of the monthly oil runs from the lease. The money borrowed in consideration of this note was to be deposited to the account of the oil company and then disbursed by the bank directly to creditors. On January 13, 1950 the bank disbursed up to $211,360.00. Thereafter the oil company failed to meet its first $5,000.00 a month minimum payment. There is in excess of $67,000.00 of the face value of the note undisbursed which the bank refuses to pay out.

The tool company contends that the balance of the note must be distributed to the creditors, even though the note be in default, because, it says, the bank's contract to lend the money was for the benefit of creditors who can demand that the entire loan be completed and disbursed. The trial court and a majority of the Court of Civil Appeals agreed.

This controversy arises from a cover letter from the oil company to the bank (delivered simultaneously with the execution of the note and deed of trust—December 27, 1949) containing the following paragraph:

"Advances by you under such loan are to be credited to the deposit account of Mystic Oil Corporation with you. Out of such advances you are authorized and instructed to make or cause disbursements to be made as follows: (1) a disbursement to the Fort Worth National Bank at Fort Worth, Texas of approximately $27,500.00 to pay off and discharge a deed of trust lien dated September 19, 1949; (2) a disbursement to Dallas National Bank in the sum of approximately $50,000.00 to pay off and discharge liens created by Assignments from Louis Burns to Curtis Norman dated May 27, 1949 and from Louis Burns to Dallas National Bank dated June 7, 1949; (3) disbursements to materialmen and contractors holding liens of record in the approximate amount of $12,758.00 arising from bills for labor and materials on wells Nos. 1 and 2; (4) a disbursement to Louis Burns or to his credit, in the amount of $16,800.00; (5) another disbursement to Louis Burns or to his credit in the amount of $35,000.00. Subsequent advances and disbursements are to be made on account of bills for labor and materials and equipment on wells Nos. 4 and 5, and official instructions with regard thereto will be furnished."

■ Since the account at bar was not specifically mentioned, the last sentence quoted above is crucial. This sentence did not direct the bank to disburse the money to all creditors on Well No. 5. It said that "subsequent * * * disbursements are to be made on account of * * *" bills for Well No. 5 and "* * * official instructions * * * will be furnished." We hold that if there be any ambiguity in this sentence the parties have themselves construed the contract as requiring that disbursements from the deposit account be upon a specific authorization for each item. We base this upon the following evidence.

The account sued upon at bar was for supplies furnished for Well No. 5. Two days (December 29, 1949) after the delivery of the note, the oil company sent to the bank a list of creditors and amounts due for wells Nos. 3, 4, and 5. The next day the oil company delivered to the bank the following letter:

"Dallas, Texas
December 30, 1949

"Mercantile National Bank at Dallas
Mercantile Bank Building
Dallas 1, Texas

Re: Disbursements from Loan
Account of Mystic Oil
Corporation

"Gentlemen:

You are hereby authorized to disburse out of the above account payments for our No. 4 well in an amount not exceeding Sixty-Two Thousand One Hundred Seventeen and 74/100 ($62,117.74) Dollars.

These disbursements to creditors are to be made in the amounts heretofore listed and submitted to you, and in accordance with our conversation of December 29th current.

Very truly yours,
MYSTIC OIL CORPORATION
*John J. Shanahan, President*
By *John G. Connally*

ATTEST:

W. J. Gerron
Secretary-Treasurer

SEAL"

Subsequently (January 12, 1950) the bank wired John J. Shanahan as follows:

"Re your letter December 27, with reference to disbursements on loan to Mystic. Please supply us supplemental instructions authorizing and directing disbursements for Mystic to all the parties listed on list of unpaid bills furnished us on December 29, showing Accounts Payable on well #4 and instructions authorizing payment to Ray Harris Drilling Company on invoice dated November 10, for $1,547.67 and same company's invoice dated December 2, for $9,087.20. Please furnish such instructions by telegram and confirm by letter for our files."

Shanahan as President of the oil company replied (January 13, 1950) to this by wire and letter. The wire being:

"Brighton, Mass.
January 13, 1950

"Mercantile Natl. Bank
Dallas, Texas

"Reference your telegram you are authorized to disburse from Mystic loan account all well number four creditors listed with you December 29th and to pay Ray Harris Company on invoices for $1547.67 and $9087.20. Letter follows.

Mystic Oil Corp. John J. Shanahan,<br>President."

The letter being.

"17 Electric Avenue<br>Boston 35, Mass.<br>January 13, 1950

"Merchantile National Bank at Dallas
Merchantile Bank Building
Dallas 1, Texas

Re: Disbursements from Loan<br>Account, Mystic Oil Corpora-<br>tion, Well #4

"Gentlemen:

"You are hereby authorized to disburse out of the above account payments for our well #4 in an amount not exceeding sixty-two thousand one hundred seventeen and 74/100ths ($62,117.74) dollars.

"These disbursements are to be made in the amounts heretofore listed and submitted to you and in accordance with our conversation of December 29th, our letter of December 30th and our telegram of even date, of which latter this letter is a confirmation.

"We request, at your early convenience, that you furnish us with an itemized statement, listing creditors and amounts paid out, of the loan account through and including these authorized disbursements.

Very truly yours,<br><br>Mystic Oil Corporation<br><br>by <i>John J. Shanahan</i><br>John J. Shanahan, Pres."

Therefore this much is clear. The advances obtained upon

the note were to be deposited to the credit of the oil company and disbursed according to further instructions.

Since before default the power to grant an authorization to pay a particular account or withhold it lay with the oil company, the tool company could not possibly have had a direct action against the bank before authorization of its account for payment. McCown v. Schrimpf, 21 Texas 22. The trial court's findings that the only limitation upon the bank in paying creditors was the condition that Well No. 5 be a commercial producer is contrary to the terms of the contract as construed by the parties. Each separate withdrawal had to be authorized.

■ Was the bank ever authorized to pay this account? Certainly not before February 2, 1950. On that date Mr. Fred A. Bryant, an auditor for the oil company, forwarded to the bank a statement including this account.

What do the words *official instructions* in the cover letter mean? The bank introduced a corporate resolution dated December 27, 1949 (same date as cover letter) designating the bank as a depository and authorizing withdrawals in the name of the corporation from the deposit account by "any two (2) of the following: John J. Shanahan and Louis Burns; or John J. Shanahan and William J. Gerron." While this is somewhat ambiguous it obviously means that withdrawals require two signatures one of which must be Shanahan. The other may be either Burns or Gerron. The letter of December 30, 1949 (quoted above) contained the signature of Gerron and the supplemental instructions to it were signed by Shanahan. The cover letter specifically directed that the proceeds of the loan were "to be credited to the deposit account" of the corporation. We hold that the words *official instructions* means instructions satisfying the corporate resolution for a withdrawal from the same "deposit account" mentioned in the first sentence of the letter.

It is clear that there could be no withdrawal from this deposit account without express authorization from Shanahan plus one other. There is no evidence in the record that Shanahan ever approved the tool company's account for payment or directed the bank to pay it. The testimony on Mr. Bryant's furnishing of the list of accounts due is that he was requested to do so by the bank and authorized to do by by Burns. Under the corporate resolution furnished the bank Burns could not himself make a withdrawal. Neither could he alone authorize anyone else to

do so. A list of accounts due had been furnished the bank on December 29, 1949 and at that time the bank had required authorization (quoted above) satisfying the corporate resolution. The officials of the oil company immediately complied with the bank's request. Thus the parties themselves have construed this contract. We hold that the bank did not ever receive official instructions authorizing a withdrawal from the deposit account to pay the tool company.

■ On the record before us the bank's letters and statements to the tool company show on their face that the bank is not estopped to urge its defenses by reason of statements by the bank inducing the tool company to extend credit. After a careful examination of the testimony of the credit man for the tool company, we conclude that there is no evidence that the bank induced the tool company to extend credit by leading it to believe the bank would pay regardless of the success of Well No. 5. The credit was extended between November 2, 1949 and January 12, 1950, so statements made after January 12th cannot be the basis for this estoppel. The bank conditioned any statements about Well No. 5 on the well being "satisfactory" and a "producer." The tool company could not have failed to understand that if Well No. 5 was not worthy of credit the bank intended to lend no money upon it. On December 30, 1949 the bank wrote the tool company as follows:

"In answer to your telegram regarding Mystic Oil Corporation, I wish to advise you that we are in the process of closing a loan on wells 1, 3 and 4, but from the record I looked at today, I think all your bills are on well 5. The company hopes to bring this well in within the next fifteen days, and if the well is satisfactory, we will make further disbursements which would include your accounts."

■ It is immaterial that the mortgage covered the entire lease or that as between the bank and the oil company the loan could not be divided between the wells. It is the precise estoppel which must be examined. A reasonably prudent creditor should have concluded from the bank's statement that the bank had no intention of paying bills on Well No. 5 unless it was "satisfactory." In his dissent to the Court of Civil Appeals opinion Judge Hughes correctly appraises the evidence contained in this record on this point. Since the tool company urged this estoppel it had the burden of proof which included proof that Well No. 5 was satisfactory or worthy of credit. We hold that as a matter of law the record does not support this estoppel.

■ The record is so scanty on the amount of oil actually produced from Well No. 5 before it expired that this record will not support a finding that the tool company gave up a valuable right in not fixing a materialman's and laborer's lien or could have collected any appreciable amount of its debt by fixing a lien on Well No. 5.

The judgments of the trial court and that of the Court of Civil Appeals are reversed and judgment is here rendered that the tool company take nothing. Costs are taxed against the tool company (respondent here).

Opinion delivered April 1, 1953.

ON MOTION FOR REHEARING.

MR. JUSTICE WILSON delivered the opinion of the Court.

■ The tool company contends that we were in error in holding that it did not give up a valuable right in failing to file a materialman's lien. It urges an estoppel against the bank based upon alleged representations made to it by an official of the bank which caused it to refrain from filing its statutory lien. Statements alleged to have been made by the bank subsequent to January 12, 1950 are alleged to be the basis of this estoppel. The trial court found:

"'* * * In a telephone conversation between J. H. Rankin and J. M. Gray about January 30, 1950, Rankin advised Gray to send the invoices and a statement of plaintiff's account and that the bank would pay plaintiff's account, which was known at the time to be $6932.90. * * *'"

There is another finding of fact that:

"'* * * except for such promises of J. H. Rankin as Vice President of the defendant bank, the plaintiff would have filed in Tom Green County its materialman's and laborer's lien and would have had and held a good and valid lien against the leases, etc., of Mystic Oil Corporation, but because of said promises and assurances of the defendant bank the plaintiff did not file any materialman's and laborer's lien, but relied wholly on the defendant bank * * *.'"

While Article 5473, V.A.C.S. gives a materialman a lien upon an entire lease for work done upon one well, Oil Field Sal-

480

vage Co. et al. v. Simon, 140 Texas 465, 168 S.W. 2d 848, these findings will not support the judgment either in contract or estoppel.

The motion for rehearing is overruled.

Opinion delivered July 22, 1953.