### No. 18,641 - 18,702.

FRANK LANDAUER, ET AL. *v.* MILLARD HUEY, ET AL.
MILLARD HUEY, ET AL. *v.* FRANK LANDAUER, ET AL.
(352 P. [2d] 302)

Decided May 16, 1960.

Mr. RAYMOND J. GENGLER, Mr. JOHN H. SCHULTZ, for Landauer and Smith.

Mr. ANTHONY F. ZARLENGO, Mr. EDWARD N. JUHAN, for Huey and Christensen.

*In Department.*

Opinion by MR. JUSTICE DOYLE.

LANDAUER and SMITH were defendants in an action instituted by Huey and Christensen in the district court of Morgan County. They seek review of the judgment by writ of error in case No. 18,641 in this Court. Huey and Christensen also bring error to review of portions of the same judgment by writ of error in No. 18,702. The two writs of error have been consolidated and Huey and Christensen will be here referred to as plaintiffs and Landauer and Smith as defendants, as they appeared in the trial court.

Essentially, the action is one for breach of contract and involves three claims for relief. In the first of these the plaintiffs alleged that on January 5, 1956, they entered

into a contract with defendants whereby they agreed to assign certain oil and gas leases to the defendants subject to overriding royalties. It was further alleged that they assigned the leases and that the contract required defendants to commence drilling an oil well on March 1, 1956, and that in the event this well was "capable of commercially producing oil or gas in commercial quantities, "the defendants were then obligated to continue drilling on the property; that the next well was required to be commenced within 60 days from the completion of the last producing well.

According to further allegations, defendants drilled two wells capable of producing oil in commercial quantities but failed to drill a third well within 60 days required by the contract. It was further alleged that under the terms of the contract defendants were obligated to reassign the leases to the plaintiffs but that they failed to do so. In lieu of the reassignment, damages were demanded in the amount of $120,000.

In plaintiff's second claim, it is alleged that the contract provided that plaintiffs assist in obtaining leases on additional acreage. Plaintiffs allege that they did so; that they are entitled to a 15% overriding royalty on the leases so obtained, and that the defendants have refused to assign this royalty interest to them.

In their third claim, plaintiffs allege that they entered into a contract on March 14, 1956, with the defendants under the terms of which they were entitled to a 1/32nd working interest in leases on certain described land; that plaintiffs paid their share of the drilling expense but that defendants refused to assign the working interests. It was alleged that this 1/32nd interest is in 280 acres of a 320 acre tract.

The defendants' answer admits the agreement but denies that the two wells drilled were capable of producing oil or gas in commercial quantities; denied the allegations of the second claim and alleged that the contract is too indefinite and uncertain to be enforced.

In response to the third claim, defendants admit the contract, admit the payment, deny that the money was used for drilling expenses and allege that the contract is vague and uncertain.

The evidence establishes that the plaintiffs acquired the oil and gas leases here in question from the Milliron Corporation and that they entered into a contract with the defendant Landauer on January 5, 1956, which provided that they would assign such leases to Landauer in consideration of the promise of Landauer to drill the wells. They reserved an undivided 15% of 8/8ths overriding royalties. The language of the contract here in question is as follows:

"That in the event the first well drilled is capable of commercially producing oil or gas in commercial quantities, Second Party shall continuously drill such property with due diligence, but in no event a time greater than (60) days from the completion of the last producing well.

"That in the event the first well drilled on the property is a dry hole, Second Party shall have six (6) months from the date of abandonment of said well to commence the drilling of a second well at any location on the property heretofore described. In event the second well is not drilled, Second Parties will reassign leases to First Party."

Subsequently and on February 12, 1956, the contract was amended to reduce the overriding royalty from 15% to 12½% of 8/8ths, and on March 14, 1956, plaintiffs assigned the leases to Landauer in accordance with the provisions of the January 5 contract.

On March 5, 1956, Landauer finished the first well which was called Rocchio 1-A. Production started on this well on April 8, 1956, and within the 60 day period on April 17, 1956, the Rocchio 2-A was completed. On June 22, 1956, plaintiffs notified Landauer that he had not complied with the terms of the contract requiring continuous drilling and that he had not commenced a well within 60 days from the completion of the last pro-

ducing well. They demanded reassignment of the acreage with the exception of the tracts on which the two producing wells were located. The language upon which the second claim for relief is predicated reads:

"It is mutually agreed between the respective parties that each will devote their best efforts to obtaining from Anderson-Pritchard acreage within this immediate area. First party agrees to assist in obtaining leases on additional acreage for fifteen per cent (15%) override. (Bill Brandt acreage to carry 15% ORR) (Anderson-Pritchard acreage to carry 5%.")

There is conflict on the testimony as to the acreage referred to in the above provision. The plaintiff Huey testified that it was the acreage formerly owned by Milliron Corporation. E. D. Smith, one of the defendants, testified that there was no discussion of any acreage other than that specifically mentioned. There was testimony that Huey had participated in discussions relating to obtaining some acreage which Landauer and Smith ultimately negotiated.

The particular portion of the contract of March 19, 1956, which comes into play in connection with the third claim for relief reads as follows:

"Landauer agrees that for the consideration set out above he will finance the cost of drilling the aforementioned well and in addition he agrees to assign to Millard Huey a 1/32 working interest subject to overrides and other commitments in 280 acres in the W½ of Section 10, 4 North, 60 West."

The evidence was undisputed that the assignment provided for in the March 19, 1956, agreement was never made, and the trial court so found. Landauer was ordered to make this assignment and it was further determined that he was unable to do so, having conveyed this, together with other interests, to third persons. Thereafter, the trial court held a hearing to determine the value of this interest. Plaintiffs seek modification of the court's determination. They contend that they

are entitled to an accounting on the theory that the proceeds were held by Landauer as constructive trustee.

The trial court further found that the Rocchio 2-A well was capable of producing oil and gas in commercial quantities within the terms of the contract and that this was true at the end of the 60-day period following the completion of the Rocchio 2-A. The court concluded, in view of this fact, that it was immaterial whether the Rocchio 1-A was a commercial producer and further found that Landauer was obligated, the Rocchio 2-A being a commercial well, to continue to drill; that in failing to do so he violated the terms and conditions of the contract. The court ordered assignment of the leases to the plaintiffs, or in the alternative, a judgment in the amount of $30,000.

As to the plaintiffs' second claim, the court concluded that the plaintiffs failed to sustain the burden of proof and thus found for the defendants.

The findings on plaintiffs' third claim were in their favor and defendants were ordered to convey a 1/32nd working interest in the W½ of Section 10 within a period of 30 days.

Defendants seek reversal and contend:

1.  That the trial court erred in receiving documentary evidence relative to the question whether or not the wells drilled were commercial wells.

2.  That the measure of damage fixed by the court was incorrect and unsupported.

3.  That under the terms and conditions of the contract it was necessary for the trial court to determine whether the Rocchio 1-A was a commercial well and that evidence was insufficient to establish this fact.

4.  That absent a finding with respect to whether Rocchio 1-A was a commercial producer, the judgment is erroneous.

On this review, plaintiffs seek affirmance of the judgment so far as the first and third claims for relief are concerned; but urge reversal as to the second claim.

## I.

*The question whether the court erred in receiving documentary evidence.*

The evidence in question consists of the report of a geologist who had been employed by defendant Landauer. This report dealt with whether the wells were commercial. It is said that it was error for the trial court to receive this report in evidence; that the pre-trial order had provided that counsel "shall exchange prior to trial such maps, logs, records of oil runs and other documentary evidence of a technical matter relating to the question as to whether or not the well or wells were commercially producing wells." It is claimed that the pre-trial order was not carried out with respect to this report as well as certain other documents and that therefore it was not admissible. They maintain that the defendant Landauer was prejudiced because he did not have notice of intention of plaintiffs to utilize this evidence. On this subject the trial court commented:

"THE COURT: Insofar as the Pretrial Order is concerned, I think it would be well to comment on that now. I am not denying, of course, your right to this objection. I think you are entitled to make the objection. However, the purpose of the Pretrial Conference and the Pretrial Orders is to prevent surprise, and I am sure counsel will recall that at the time of the Pretrial Conference, *these matters were discussed in detail and counsel for both sides expressed no concern about documentary evidence that was a matter of record or was in the possession of the parties at that time.*

"While the Order as it appears in the record is a Minute Order summarizing the results of the conference, I am sure the object that was in the mind of the Court and of counsel at the time the order was entered was a reference to documentary evidence of a technical nature that was either then prepared, or would be prepared in preparation for trial, by experts who, at that time,

might have been unknown to counsel, or who would prepare instruments not available to counsel.

"I don't think it was the purpose or intent of the Order of the Court at that time, or of counsel at that time, to cover matters that were either in the possession of both parties or in the possession of an opposing party, as the case may be. I can't see that there would be any surprise insofar as this exhibit is concerned, and the objection will be overruled." (Emphasis supplied.)

■ The document in question was not within the purview of the pretrial order. It was in the possession of defendant Landauer before the trial, and it is therefore impossible to conclude that there was any prejudice incident to its reception in evidence. See *Ferguson v. Hurford,* 132 Colo. 507, 290 P. (2d) 229, and see Rule 16, Colorado Rules of Civil Procedure.

Nor are we able to perceive merit in the contention that the trial court erred in receiving *photostatic* copies of the official records from the Oil and Gas Conservation Commission of Colorado. These reports contained information furnished by defendants. Their authenticity was for the trial court. The admission of these documents was not error.

## II.

*The question whether the failure of defendants to drill an additional well within 60 days following completion of the Rocchio 2-A constituted a breach of contract.*

The contract in suit made provision for two distinct contingencies: *First,* that if the first well drilled was capable of producing oil and gas in commercial quantities, then the defendants were obligated to drill within 60 days from the completion of the last producing well. *Second,* that if the first well drilled was a dry hole, the defendants would have 6 months from the date of abandonment of said well to commence drilling a second well. The second contingency did not come to pass as the first well, the Rocchio 1-A, was not a dry hole. This well was completed by the defendants at considerable cost and as

of the present time is producing. Nevertheless, defendants urge that plaintiffs' evidence failed to show that it was "capable of producing oil and gas in commercial quantities" and consequently, they contend, the trial court erred in holding that they were in default. Sixty days after the completion of the Rocchio 2-A, which was shown to be a substantial producer, and defendants do not contend that it is not, they had not commenced the drilling of a third well. Their position is that this is immaterial; that the trial court was required to determine whether the Rocchio 1-A was a commercial producer and that its failure to make this determination renders its holding of default erroneous. We are unable to agree with defendants' contention for the following reasons:

1. The evidence in the record was sufficient (at least in the present fact setting) to establish that the Rocchio 1-A was capable of commercially producing oil * * * in commercial quantities. The completion reports filed by Landauer with the Oil and Gas Conservation Commission disclose that the well first started producing oil at the rate of 46 barrels per day. The plaintiff Huey testified that the well was completed as an oil well and that it overflowed a 250 barrel tank when they left it open one night. He also testified that he had been receiving royalty checks each month. Christensen testified that he received a royalty check for production from Rocchio 1-A for the month of April and that the production for both of the wells for the month of April exceeded 2,000 barrels of oil. The accountant for Landauer testified as to the combined production of the Rocchio 1-A and Rocchio 2-A. He said that for April it was 2602 barrels, for May 4733 and for June 3534 barrels. He said that it was not possible to determine the individual production of the wells due to the fact that the oil from both flows into the same tank. The defendant Landauer's geologist reported that "the first commercial production was found by Landauer & Associates at the No. 1-A Rocchio * * * in March of this year * * *. "While this was the first

well completed for commercial production in the area, all of the previous wells had substantial oil and/or gas shows. * * * ."

■ The chief petroleum engineer for the Oil and Gas Conservation Commission testified that in his opinion the Rocchio 1-A was a commercial producer.

In view of these facts, together with the interpretation given by defendants to the provisions of the contract, we perceive no merit in the contention that the plaintiffs' evidence was insufficient to establish that the Rocchio 1-A was a commercial producer and not a dry hole. Defendants completed the well and treated it as a producer, and hence there seems little basis for their present contention. The fact that they drilled a second well within 60 days following the completion of the Rocchio 1-A attests further to the fact that they considered it a commerical producer.

■ The applicable standard for determining whether a well is commercial in circumstances like the present would appear to be whether it will return a profit over operating expenses and not whether it will return a profit after recovery of all drilling expenses. 2 Summers, *Oil and Gas*, Sec. 306, *Sunburst Oil and Refining Co. v. Callender*, 84 Mont. 178, 274 P. 834, *Mercantile Nat. Bank v. McCullough Tool Co.*, Tex. Civ. App. 250 S.W. (2d) 870; reversed on other grounds, 152 Tex. 471, 259 S.W. (2d) 724; *Nystel v. Thomas*, 42 S.W. (2d) 168.

■ 2. The contract provided alternative contingencies, on the one hand, a commercial producer and on the other hand, a dry hole. Since the well was a producer (it is even now being pumped) and not a dry hole, it is reasonable to suppose that it was a commercial producer within the contemplation of the parties. This is evidenced by defendants' conduct in drilling a second well within 60 days after completion of Rocchio 1-A, and is compelling evidence that they so interpreted the contract.

■ 3. The trial court's conclusion that whether the Rocchio 1-A was commercial was immaterial in view of

the fact that the Rocchio 2-A was conceded to be commercial is also a tenable approach to holding that defendants were in default. On this the court determined:

"Insofar as the First Cause of Action is concerned, I am convinced that the facts establish that the Rocchio No. 2 well is capable of producing oil and gas in commercial quantities, as the term was used in the contract, and by drilling the Rocchio No. 2, the question of whether the Rocchio No. 1 was a commercial producer or not, I think, becomes immaterial. I am satisfied, from a reading of the contract, from the interpretation that was put on it by the parties and even from Mr. Smith's testimony that the defendants were obligated to continue drilling that property and by their failure to do so, they have breached the contract."

We conclude that the defendants were required under the contract to drill an additional well within 60 days following the completion of the Rocchio 2-A. Their failure to comply with this requirement constituted a breach of contract, and the trial court was correct in so holding.

### III.

*The question whether the court erred in awarding damages.*

Based upon the cost of drilling the well, the court awarded damages in the sum of $30,000.00. Defendants urge that this was not the proper measure of damages (assuming a breach of contract). They maintain that the correct measure of damage for breach of a covenant to drill a well is the loss of royalty suffered from the failure to drill.

Although there are cases which have recognized the rule advocated by defendants, a study of the decisions discloses that the measure of damages applied by the trial court is proper in circumstances such as those present here where there is a violation of an unconditional covenant to drill, and where the lease has been assigned in consideration of such a covenant. It is reasoned that limiting recovery to the amount of royalty

lost is not practical and does not serve to compensate the assignor-promisee. This is summarized in 3 Summers, *Oil and Gas* §434, p. 26, as follows:

" * * * The contention of defendants that the amount of rents and royalties the plaintiff would have received, in the event of discovery, in paying quantities, is the proper measure of damages in such cases, is answered by the judges in these cases pointing out the difficulty of making proof of discovery and the amount of such production effectually denies the plaintiff any remedy for breach of the contract, or else it subjects the defendant to an equally grave injustice, that is, the pure guess of a jury as to the fact of discovery and the amount of production, and consequently the amount of the damages. The reasonable cost of drilling the well is seemingly selected by these courts as the correct measure of damages because it may be readily ascertained with a fair degree of exactness, and it is substantially the equivalent in value of the act to be done."

This measure of damage is also approved in *Evsenback v. Cardinal Petroleum Co.,* 110 Okla. 12, 236 Pac. 10, and in *Mitchel, Jones and May v. Dabney* (Tex. Civ. App.), 294 S.W. 243. In *Waldrip v. Hamon,* 136 Fed. Supp. 413, the cost of drilling standard was recognized as applicable to a case such as that before us. There it was said:

" * * * Although plaintiffs cite authorities from Oklahoma wherein the 'cost of the well' was determined to be the proper measure of damage for failure to drill an agreed upon well, such authorities are inapplicable to the case at bar. Where the courts have applied such a norm two basic conditions have existed. First, the breached contracts were ones wherein there was an unconditional promise to drill specific wells, with the drilling of a well, or wells, the paramount object in view. Secondly, the cost of the well appeared to be the most logical rule to apply to determine the exact extent of the loss of the promisee because of the breach."

The cases relied on by defendants involve breach of

covenant to mine or produce oil or a relationship other than that of assignor-assignee and thus are not germane to evaluation of loss resulting from an unconditional promise to drill a well by an assignee where the drilling of the well is the consideration for the assignment.

## IV.

*The issue whether plaintiffs were entitled to an overriding royalty for services rendered in connection with the obtaining of leases.*

As indicated above, the January 5 contract made provision for obtaining leases with respect to the "Anderson-Pritchard" acreage and also provided that plaintiffs would assist in obtaining leases on additional acreage for a 15% overriding royalty. The plaintiffs claim that they are entitled to royalty on the Martin-Leffler lands which are shown on the map in evidence. The testimony established that the plaintiff Huey rendered some services in connection with the obtaining of leases in the Martin-Leffler areas. A question existed at the trial as to whether this land was within the general area apart from the "Anderson-Pritchard" acreage which was specifically named and which the parties intended to include. The trial court resolved this question against the plaintiffs, the court commenting:

"Insofar as the Second Claim for Relief is concerned, regarding the Martin-Leffler lands in the gray and brown marked on the map, Plaintiffs' Exhibit B, the Court finds generally for the defendants and against the plaintiffs insofar as their claim for overriding royalty is concerned. That finding is based primarily upon a failure to sustain the burden of proof. In other words, the Court is not convinced first, that it was the intention of the parties at the time the contract was made or that the contract is subject to interpretation that the Martin-Leffler land was to have been included in the transaction, nor that if it was discussed at that time, there was a strict compliance with the provisions that would entitle

the plaintiffs to a 15% override in the gray and brown acreage."

In view of the ambiguity of the contract, and the trial court's findings regarding the dearth of evidence to establish the intention of the parties, we are constrained to affirm this part of the judgment.

## V.

*The propriety of the court's ruling with respect to the third claim for relief.*

■ The judgment specifically enforcing the plaintiffs' third claim for relief, which directed defendants to convey to plaintiffs a 1/32nd working interest in 280 acres of the W½ of Sec. 10, 4 N, 60 W, was proper, and the judgment granting the plaintiffs a money award in lieu of such conveyance for the value of the interest in question, must be affirmed. The contention of plaintiffs that they are entitled to a measure of damage different from that which was awarded must be rejected.

The trial court ruled that in the event the defendants failed to convey the 1/32nd working interest that a master be appointed to determine value. Subsequently this determination was made and a judgment was awarded in the sum of $1610.00. This was based upon testimony taken in a subsequent hearing and upon the findings of the master. We are unable to agree that the plaintiffs are entitled to damages based upon the theory of constructive trust (seemingly first raised in this Court) in view of the fact that the matter was tried below upon the theory of specific performance and then money had and received or conversion. There is no indication that the constructive trust theory was even presented to the trial judge. Consequently we are not at liberty to consider it.

The judgment of the trial court is affirmed.

Mr. Justice Moore and Mr. Justice Knauss concur.