42 A.3d 261

**T.W. PHILLIPS GAS AND OIL CO. and PC Exploration, Inc., Appellees**

**v.**

**Ann JEDLICKA, Appellant.**

Supreme Court of Pennsylvania.

Argued April 13, 2010.

Decided March 26, 2012.

William Shaw Stickman, IV, Del Sole Cavanaugh Stroyd, L.L.C., Pittsburgh, for Ann Jedlicka.

Walter A. Bunt, Jr., Pittsburgh, Michael James Ross, K&L Gates, LLP, for PC Exploration Inc.

Michael S. Delaney, Michael S. Delaney Law Office, Indiana, for T.W. Phillips Gas and Oil Company.

David Glenn Oberdick, Stacey Marie Noble, Meyer, Unkovic & Scott, L.L.P., Pittsburgh, for Appellee Amicus Curiae, Pennsylvania Oil and Gas Association & the Independent Oil and Gas Association of Pennsylvania,

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Justice TODD.

This Court granted allowance of appeal in the instant case to determine the proper test for evaluating whether an oil or gas lease has produced "in paying quantities," as first discussed by this Court in *Young v. Forest Oil Co.*, 194 Pa. 243, 45 A. 121 (1899). After careful consideration, we hold that, where, as here, production on a well has been marginal or sporadic, such that for some period profits did not exceed operating costs, the phrase "in paying quantities" must be construed with reference to an operator's good faith judgment. Furthermore, as we find the lower courts considered the operator's good faith judgment in concluding the oil and gas lease at issue in the instant case has produced in paying quantities, we affirm the order of the Superior Court affirming the judgment entered by the trial court in favor of T.W. Phillips Gas and Oil Co. and PC Exploration, Inc. (collectively, "Appellees").

Appellant, Ann Jedlicka, is the owner of a parcel of land consisting of approximately 70 acres located in North Mahoning Township (the "Jedlicka tract"). Title to the Jedlicka tract was conveyed from James and Anna Jedlicka, husband and wife, to Anna Jedlicka and Ann Jedlicka, mother and daughter, in October 1979. The Jedlicka tract is part of a larger tract of land consisting of approximately 163 acres, which was conveyed to Samuel Findley and David Findley by deed dated February 24, 1925 (the "Findley property"). In 1928, Samuel Findley and David Findley conveyed to T.W. Phillips Gas and Oil Co. ("T.W. Phillips") an oil and gas lease covering all 163 acres of the Findley property (the "Findley lease"), which included the Jedlicka tract. The Findley lease, characterized as a pressure lease, established royalty payments to the lessor based upon the pressure of the well. The lease also contains a habendum clause, which provides:

To have and to hold the above-described premises for the sole and only purpose of drilling and operating for oil and gas with the exclusive right to operate for same for the term

of two years, and as long thereafter as oil or gas is produced in paying quantities, or operations for oil or gas are being conducted thereon, including the right to drill other wells.

Lease, July 2, 1928, at 1 (R.R. at 13a–14a). Notably, the term "in paying quantities" is not defined in the lease. Subsequently, the Findley property was subdivided and sold—including the Jedlicka tract—subject to the Findley lease.

In 1929, pursuant to the Findley lease, T.W. Phillips drilled four gas wells, identified as Well Nos. 1 through 4. Well No. 4 is situated on what is now the Jedlicka tract. Well No. 2 was temporarily abandoned in 1955, and Well No. 4 was temporarily abandoned in 1953. All four wells were fractured in 1967 [1] and eventually assigned to PC Exploration, Inc. ("PC Exploration") on June 15, 2004. Thereafter, PC Exploration drilled four additional wells, identified as Well Nos. 6 through 9.[2] Jedlicka has received royalties and free gas throughout the life of the lease.

Subsequently, PC Exploration made plans to drill four more wells—Well Nos. 10 through 13—on the Jedlicka tract. Jedlicka objected to the construction of these new wells, claiming that T.W. Phillips failed to maintain production "in paying quantities" under the habendum clause of the Findley lease, and, as a result, that the lease lapsed and terminated. Specifically, Jedlicka argued that there has not been continuous production in paying quantities on the wells because, in 1959, T.W. Phillips suffered a loss of approximately $40 as a result of operations under the Findley lease.

In 2005, Appellees filed a declaratory judgment action against Jedlicka to determine their rights with regard to the Jedlicka tract under the Findley lease. Appellees maintained

1. Hydrofracturing, or fracking, is a method used to stimulate production of a well. A specially blended liquid is pumped down the well and into a formation under pressure high enough to cause the formation to crack open, forming passages through which oil or gas can flow into the wellbore. *See, e.g., U.S. Steel Corp. v. Hoge*, 503 Pa. 140, 144 n. 1, 468 A.2d 1380, 1382 n. 1 (1983) ("Hydrofracturing is the forcing of fluids under pressure into the well so as to cause a fracturing of the target stratum.").

2. The parties do not make reference to a Well No. 5.

that the Findley lease remains valid; that the wells on the original Findley property have produced gas in paying quantities because they have continued to pay a profit over operating expenses; and that they have operated the wells in good faith to make a profit. Prior to trial, Jedlicka filed a motion *in limine* to exclude evidence of Appellees' post–1974 operating expenses and revenues for Well Nos. 1 through 4 because Appellees did not have any depletion schedules[3] for those wells after 1974. The trial court denied the motion and allowed Appellees to introduce other evidence of expenses, revenue, and production.

Appellees then filed a motion *in limine,* opining that Jedlicka's claims were barred by operation of Rule 1901 of the Pennsylvania Rules of Judicial Administration.[4] Appellees noted that, in 1988, Jedlicka commenced an action by writ of summons challenging the validity of the Findley lease, but that action was dismissed with prejudice as an inactive case pursuant to Pa.R.J.A. 1901. Appellees further noted that Jedlicka failed to allege any reasons for such inactivity in a timely petition for permission to reinstate the cause of action. Accordingly, Appellees argued that Jedlicka should be precluded from presenting any evidence or testimony regarding the production or operation of the wells on the Findley property prior to 1988. The trial court heard testimony on Appellees' motion and determined that the lease at issue in the 1988 action was the same as the lease at issue in the case *sub judice;* however, the trial court was unable to conclude that the issues in the two actions were identical, or that Jedlicka was attempting to argue the same claims, and thus denied Appellees' motion.[5]

3. Depletion schedules are used to show the operating expenses and amount of revenue generated by each well.

4. Rule 1901, titled "Prompt Disposition of Matters; Termination of Inactive Cases," permits a court, after giving a minimum of 30 days notice, to enter an order terminating a matter where the matter has been inactive for an unreasonable period of time. Pa.R.J.A. 1901(a).

5. Shortly prior to trial, Jedlicka filed a supplemental trial memorandum arguing that Appellees breached the Findley lease by failing to meter Well No. 4 and pay a 1/8 royalty as set forth in 58 P.S. §§ 33–35.

On April 16, 2007, a bench trial was held before President Judge William J. Martin of the Indiana County Court of Common Pleas. Following trial, President Judge Martin determined that, notwithstanding the $40 loss suffered in 1959, Appellees had produced gas on their leasehold in paying quantities, and, therefore, that the Findley lease remained in effect. In determining that Appellees produced gas in paying quantities, the trial court relied on this Court's 1899 decision in *Young v. Forest Oil*, wherein we held that consideration should be given to a lessee's good faith judgment when determining whether oil was produced in paying quantities. The trial court noted that Appellees "continued efforts in production after 1959 and [the owners of the Jedlicka tract] continued to receive royalty payments per the lease for more than thirty years without asserting that the lease had expired." *T.W. Phillips Gas and Oil Co. and PC Exploration, Inc. v. Jedlicka*, No. 10362 CD 2005, at 5.

Additionally, the trial court rejected Jedlicka's suggestion that, instead of the *Young* test, the court should apply a test utilized by federal and some state courts, under which courts "interpret[ ] gas leases in a more objective manner using a computation of production receipts minus royalty minus expenses including marketing, labor, trucking, repair, taxes, fees and other expenses." *T.W. Phillips Gas and Oil Co. and PC Exploration, Inc.*, No. 10362 CD 2005, at 5–6. Recognizing that the objective approach favored by Jedlicka incorporates

Section 33, titled "Guarantee of minimum royalties," provides that an oil or gas lease which does not guarantee the lessor at least 1/8 royalty of all oil, natural gas, or gas removed or recovered from the property is invalid. 58 P.S. § 33. Sections 34 and 35 provide for the metering and escalation of royalties under leases which do not provide for a 1/8 royalty at the time of the April 1985 effective date of the Oil and Gas Act, 58 P.S. §§ 601.101 *et seq.* (the "Act"). Appellees objected to her filing on the basis that they did not have an opportunity to respond to or challenge the Act's constitutionality. Noting that Jedlicka had not previously raised this argument, thus depriving Appellees of an opportunity to argue the constitutionality of the Act, the trial court held that Jedlicka was precluded from raising the issue, "without prejudice to raise it appropriately." *T.W. Phillips Gas and Oil Co. and PC Exploration, Inc. v. Jedlicka*, No. 10362 CD 2005, unpublished memorandum opinion at 4, 2007 WL 6913660 (Indiana Cty. Common Pleas, filed July 16, 2007). This issue is not presently before this Court.

the concern that "lessees should not be allowed to hold land indefinitely for purely speculative purposes," the trial court noted that Pennsylvania has not adopted this objective approach, and nevertheless concluded that "based upon all of the testimony and other evidence presented, the rationale utilized in support of a completely objective test is not applicable herein." *Id.* at 6. The trial court explained, in particular, that the Findley lease "is a pressure lease, not a 1/8 royalty lease," and "[t]he evidence indicates that the lessees were operating the wells in good faith and there was no evidence that they were holding the land for purely speculative purposes." *Id.*[6]

On November 26, 2008, the Superior Court affirmed the decision of the trial court in an unpublished memorandum opinion, which, upon joint motion of the parties, was subsequently published. *T.W. Phillips Gas and Oil Co. and PC Exploration, Inc. v. Jedlicka,* 964 A.2d 13 (Pa.Super.2008). The Superior Court first concluded that our decision in *Young,* although more than a century old, remains good law. The Superior Court further found that, under *Young,* "the good faith of the lessee is a necessary determination," and held that Jedlicka failed to carry her burden of establishing that Appellees acted in bad faith. *T.W. Phillips Gas and Oil Co. and PC Exploration, Inc.,* 964 A.2d at 19. Jedlicka petitioned for allowance of appeal, and, on July 29, 2009, this Court granted her petition to consider the following issue: "Did the Superior

6. We note that, under the habendum clause, the Findley lease remains valid as long as "oil or gas is produced in paying quantities," **or** as long as "operations for oil or gas are being conducted thereon, including the right to drill other wells." Lease, July 2, 1928, at 1 (R.R. at 13a–14a) Thus, even if gas or oil were not produced in paying quantities, Appellees' rights under the lease would remain intact for as long as "operations" are conducted. The trial court did not address this possibility in its opinion, and, despite Appellees' assertions that "[f]rom the date of the Findley Oil and Gas Lease to the present, . . . operations for oil or gas have been conducted," *see* Appellees' Pretrial Memorandum, at 3 (R.R. at 60a), a review of the trial transcript reveals that there was some dispute, not only as to whether Appellees conducted operations for gas during the period of the lease, but also as to what activities constituted "operations" in the first instance. As a result, we are unable to determine whether the Findley lease remains valid under the second part of the habendum clause. Given our disposition of the "in paying quantities" issue, however, such determination is unnecessary.

Court misapply the decision of this Court in *Young v. Forest Oil Co.*, 194 Pa. 243, 45 A. 121 (Pa.1899), by holding that Pennsylvania employs a purely subjective test to determine whether an oil or gas lease has produced 'in paying quantities.'" *T.W. Phillips Gas and Oil Co. v. Jedlicka*, 602 Pa. 154, 978 A.2d 347 (2009) (order).[7]

When reviewing the findings of a court in equity, an appellate court's review "is limited to a determination of whether the chancellor committed an error of law or abused his discretion. A final decree in equity will not be disturbed unless it is unsupported by the evidence or demonstrably capricious." *Kepple v. Fairman Drilling Co.*, 532 Pa. 304, 312, 615 A.2d 1298, 1302 (1992) (internal quotation marks omitted). Although facts found by the chancellor, when supported by competent evidence in the record, are binding, no such deference is required for conclusions of law, which we review *de novo*. *Id.*

Furthermore, a lease is in the nature of a contract and is controlled by principles of contract law. *J.K. Willison v. Consol. Coal Co.*, 536 Pa. 49, 54, 637 A.2d 979, 982 (1994). It must be construed in accordance with the terms of the agreement as manifestly expressed, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *Id.* (citations omitted). Further, a party seeking to terminate a lease bears the burden of proof. *See Jefferson County Gas Co. v. United Natural Gas Co.*, 247 Pa. 283, 286, 93 A. 340, 341 (1915).

In order to better assess the parties' arguments in the case *sub judice*, we consider briefly the unique characteristics of an oil and gas lease. As this Court recognized in *Brown v. Haight*, "[t]he traditional oil and gas 'lease' is far from the simplest of property concepts. In the case law oil and gas

7. The Pennsylvania Oil and Gas Association and the Independent Oil and Gas Association of Pennsylvania have filed a joint *amicus* brief in support of the position of Appellees, i.e., that this Court's decision in *Young*, requires consideration of an operator's good faith judgment when determining whether a well has produced in paying quantities.

'leases' have been described as anything from licenses to grants in fee." 435 Pa. 12, 15, 255 A.2d 508, 510 (1969). Generally, however, the title conveyed in an oil and gas lease is inchoate, and is initially for the purpose of exploration and development. *Calhoon v. Neely*, 201 Pa. 97, 101, 50 A. 967, 968 (1902); *Burgan v. South Penn Oil Co.*, 243 Pa. 128, 137, 89 A. 823, 826 (1914) ("The title is inchoate, and for purposes of exploration only until oil is found." (internal quotation marks omitted)); *see also Hite v. Falcon Partners*, 13 A.3d 942 (Pa.Super.2011) (same); *Jacobs v. CNG Transmission Corp.*, 332 F.Supp.2d 759, 772 (W.D.Pa.2004) (same).

■ If development during the agreed upon primary term is unsuccessful, no estate vests in the lessee. If, however, oil or gas is produced, a fee simple determinable is created in the lessee, and the lessee's right to extract the oil or gas becomes vested. *Calhoon*, 201 Pa. at 101, 50 A. at 968; *Jacobs*, 332 F.Supp.2d at 772–73. A fee simple determinable is an estate in fee that automatically reverts to the grantor upon the occurrence of a specific event. *Brown*, 435 Pa. at 18, 255 A.2d at 511. The interest held by the grantor after such a conveyance is termed "a possibility of reverter." *Higbee Corp. v. Kennedy*, 286 Pa.Super. 101, 428 A.2d 592, 595 (1981). Such a fee is a fee simple, because it may last forever in the grantee and his heirs and assigns, "the duration depending upon the concurrence of collateral circumstances which qualify and debase the purity of the grant." *Id.* at 595 n. 4 (quoting *Slegel v. Lauer*, 148 Pa. 236, 241, 23 A. 996, 997 (1892)).

Within the oil and gas industry, oil and gas leases generally contain several key provisions, including the granting clause, which initially conveys to the lessee the right to drill for and produce oil or gas from the property; the habendum clause, which is used to fix the ultimate duration of the lease; the royalty clause; and the terms of surrender. *Jacobs*, 332 F.Supp.2d at 764 (citing 3 Howard R. Williams & Charles J. Meyers, Oil and Gas Law § 601 (2003)). Further,

A habendum clause is used to fix the ultimate duration of an oil and gas lease. 2 Summers, THE LAW OF OIL AND GAS § 281. "The habendum clause of the modern oil and

gas lease is the result of a long process of development, in which many influences have aided in shaping its final form," chief of which have been the [distinct] interests of the lessor and lessee, the peculiar needs of the industry and the interpretation and enforcement of certain phrases by the Courts. *Id.* at § 282 Experimentation in the industry for a suitable durational term progressed from definite term leases, which placed the lessee at a disadvantage if production was only attained late in the term or extended beyond the term, to a definite term with an option to renew, to long term leases with conditional clauses extending the term through the production life of the land. *Id.* at §§ 283–287.

*Jacobs,* 332 F.Supp.2d at 765 n. 1.

Typically, as herein, the habendum clause in an oil and gas lease provides that a lease will remain in effect for as long as oil or gas is produced "in paying quantities." [8] Traditionally, use of the term "in paying quantities" in a habendum clause of an oil or gas lease was regarded as for the benefit of the lessee, as a lessee would not want to be obligated to pay rent for premises which have ceased to be productive, or for which the operating expenses exceed the income. *Swiss Oil Corp. v. Riggsby,* 252 Ky. 374, 67 S.W.2d 30, 31 (1933). More recently, however, and as demonstrated by the instant case, these clauses are relied on by landowners to terminate a lease.

As noted *supra,* the habendum clause contained in the lease at issue provides that Appellee shall have the right to drill for oil and gas for the term of two years "and as long thereafter as oil or gas is produced in paying quantities, or operations for oil or gas are being conducted thereon." Lease, July 2, 1928, at 1 (R.R. at 13a–14a). It is the meaning of the term "in paying quantities," which is not defined in the lease, that is the crux of the dispute between the parties; however, the parties

8. In some jurisdictions, the phrase "in commercial quantities," as opposed to "in paying quantities," is used. *See, e.g., Texaco, Inc. v. Fox,* 228 Kan. 589, 618 P.2d 844 (1980); *Landauer v. Huey,* 143 Colo. 76, 352 P.2d 302 (1960).

agree that the lease is controlled by our 1899 decision in *Young*.[9]

In *Young v. Forest Oil*, the plaintiff landowner sought a declaration of forfeiture of an oil lease held by the defendant due to the defendant's alleged failure to develop the land. The trial court found that the defendant had "sufficiently developed" the west end of the plaintiffs farm. However, the court determined that the drilling of a single well on the north and east portions of the plaintiff's farm, which admittedly revealed no oil or gas, did not support the defendant's refusal to drill additional wells on the remainder of the farm, because "[t]here remains a large portion of plaintiff's farm which ... ought to produce oil in paying quantities, with a reasonable degree of certainty." *Id.* at 248–49, 45 A. at 122. As a result, the trial court determined, "under the circumstances of this case the defendant's refusal to sink additional wells on plaintiff's farm is a wrongful act, amounting to a fraudulent use of the lease, to plaintiff's injury." *Id.* at 249, 45 Pa. at 122.

On appeal, this Court reversed, noting that the trial court's conclusion "proceed[ed] from an erroneous view of the law,"[10] and stating:

9. Jedlicka argues in her brief to this Court that the trial court improperly held that she waived her right to challenge the validity of the Findley lease by accepting royalties from Appellees. Jedlicka contends such a finding is contrary to established law, particularly, *Brown, supra*. Jedlicka argues that, under *Brown*, when Appellees failed to produce gas in paying quantities in 1959, any interest Appellees had in the land "lapsed as a matter of law into a tenancy at will, terminable by Ms. Jedlicka at any time," and, therefore, "there can be no waiver of any right to challenge the validity of the lease." Appellant's Brief at 16. Contrary to the terminology used by Jedlicka, the trial court in the instant case did not hold that Jedlicka *waived* her challenge to the validity of the lease. The trial court simply noted, in its discussion of the $40 loss suffered by T.W. Phillips in 1959, that Jedlicka "continued to receive royalty payments per the lease for more than thirty years without asserting that the lease had expired," and, thus, received the benefit of the bargain since the inception of the Lease in 1928. *T.W. Phillips Gas and Oil Co. and PC Exploration, Inc.*, No. 10362 CD 2005, at 5. The court then went on to address her arguments under the lease. Thus, we need not address Jedlicka's waiver contention any further.

10. Specifically, this Court concluded the trial court had "misapprehended" the scope of *Kleppner v. Lemon*, 176 Pa. 502, 35 A. 109 (1896). We explained in *Young* that *Kleppner*

In the present case the conclusion of the court rests on nothing else than such a difference of judgment. There is not a scintilla of evidence for any other basis. The lessee contracted to put down one paying well. He did in fact put down five, four of which produced oil for a time. Even considering the plaintiffs side alone, the weight of the evidence in favor of the court's conclusion is exceedingly light. Passing over the plaintiffs extraordinary reasoning, that, because one well put down in the alleged insufficiently tested part of the farm proved to be a dry hole, therefore another hole in the same portion would produce a paying well, we have looked in vain for any testimony that even the experts are willing to stake their judgments on any such result. Not a single witness says so . . . . Even if [a witness] had said so, with sufficient positiveness to convince the court as a matter of judgment, it would not have been enough. . . . The operator, who has assumed the obligations of the lease, has put his money and labor into the undertaking, and is now called upon to determine whether it will pay to spend some thousands of dollars more in sinking another well to increase the production of the tract, is entitled to follow his own judgment. If that is exercised in good faith, a different opinion by the lessor, or the experts, or the court, or all combined, is of no consequence, and will not authorize a decree interfering with him.

*Id.* at 249–50, 45 A. at 122.

With regard to the plaintiff's argument to this Court that the lease had expired because oil was no longer produced in paying quantities, we noted that, despite declining to grant the plaintiff relief on this ground, the trial judge found it unnecessary to determine the exact meaning of the phrase "in paying

was not meant to stretch the jurisdiction of equity beyond its regular and established limits, nor to blaze out any new path for proceedings on oil or gas leases, differing from ordinary remedies between lessor and lessee. It rested on fraud alleged and proved, and fraud in fact, not merely inferred from a difference of judgment between the defendant and the court as to the profitable development of the leased premises.

*Young,* 194 Pa. at 249, 45 A. at 122.

quantities." However, we nevertheless agreed the trial court was correct not to grant relief on this ground, explaining:

The phrase 'found or produced in paying quantities' means paying quantities to the lessee or operator. If oil has not been found and the prospects are not such that the lessee is willing to incur the expense of a well (or a subsequent or second well, as the case may be), the stipulated condition for the termination of the lease has occurred. So, also, if oil has been found, but no longer pays the expenses of production. But if a well, being down, pays a profit,—even a small one, over the operating expenses,—it is producing in 'paying quantities,' though it may never repay its cost, and the operation as a whole may result in a loss. Few wells, except the very largest, repay cost under a considerable time; many never do; but that is no reason why the first loss should not be reduced by profits, however small, in continuing to operate. The phrase 'paying quantities,' therefore, is to be construed with reference to the operator, and by his judgment when exercised in good faith.

*Id.* at 250–51, 45 A. at 122–23.

In *Colgan v. Forest Oil Co.*, 194 Pa. 234, 45 A. 119 (Pa.1899), which we issued on the same day as our opinion in *Young*, we elaborated on the concept of good faith judgment. Therein, the owner of land (lessor) filed a bill in equity against the lessee for specific performance of covenants contained in an oil lease, or, alternatively, for forfeiture of the lease. The lessee challenged the number of wells put down by the lessor, as well as the location of the wells. Concerning the lessee's good faith judgment, we stated:

So long as the lessee is acting in good faith on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise *until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudu-*

*lently, with intent to obtain a dishonest advantage over the other party to the contract.* Nor is the lessee bound, in case of difference of judgment, to surrender his lease, even *pro tanto,* and allow the lessor to experiment. Lessees who have bound themselves by covenant to develop a tract, and have entered and produced oil, have a vested estate in the land, which cannot be taken away on any mere difference of judgment.

*Id.* at 242, 45 A. at 121 (emphasis added).

Jedlicka argues that the lower courts in the instant case erroneously interpreted our decision in *Young* as providing for a "purely subjective," rather than objective, test to determine whether a gas or oil lease is producing in paying quantities.[11] Specifically, Jedlicka argues:

[W]hile there are some subjective factors to consider in the overall analysis, the test is not purely subjective, as the trial court found in the instant case. Rather, the threshold inquiry is whether, objectively, the lease is making a profit, "however small" over its operating expenses. The operating expenses referred to here are the day to day costs of operating the well. Some courts have referred to these expenses as "lifting expenses." The Court in *Young* was clear that if the wells do not pay this minimal cost of production, they will not be deemed to produce in paying quantities.

The subjective element is the second layer of analysis which only enters the determination when the wells have already been found to be producing in paying quantities, but that the profits are insufficient to offset the total expenses incurred in the operation as a whole—particularly those expenses associated with the exploration, drilling and inception of oil or gas extraction. In such case, the Court in *Young* explained, it is necessary to determine whether the lessee is exercising its good faith judgment as to whether

11. Jedlicka emphasizes she is not suggesting that *Young* be overruled. Indeed, she states: "To be abundantly clear, [Jedlicka] is not advocating that this Court overturn *Young* .... It has always been [Jedlicka's] contention that *Young* was properly decided ... and should, therefore, be affirmed and applied to this case." Appellant's Reply Brief at 9 n. 8.

the wells are being operated for revenue. Provided that it is, and the wells are producing in paying quantities, the lease will not lapse.

Appellant's Brief at 11–12 (citations omitted).

Based on her interpretation of *Young*, and, because it was "conclusively established that the wells under the Lease incurred a net loss in 1959 when their combined revenues were insufficient to overcome the expenses of their operation," *id.* at 15, Jedlicka contends:

[i]t was unnecessary, unprecedented and, indeed, improper, for the trial court to then inquire as to the subjective good faith of T.W. Phillips and [PC Exploration] in operating under the Lease. Once there failed to be a profit, however small, the Lease lapsed by operation of law into a tenancy at will, terminable by Ms. Jedlicka at any time.

Appellant's Brief at 15 (footnote and citations omitted).

Appellees, conversely, argue that Jedlicka's proposed construction of *Young* is inconsistent with the very language and intent of that decision. Appellees further maintain that, to the extent *Young* requires consideration of an operator's good faith when determining whether a lease has produced in paying quantities, *Young* is "reflective" of "national authority," in that

[a] number of the jurisdictions that have embraced what Jedlicka terms an "objective" standard for "paying quantities" have explicitly held that the term to be used in assessing the performance of the lease should be one long enough to "provide the information which a prudent operator would take into account in [deciding] whether to continue or abandon operation."

Appellees' Brief at 16 (citing, *inter alia, Fisher v. Grace Petroleum Corp.*, 830 P.2d 1380, 1386 (Okla.App.1991); *Ross Explorations, Inc. v. Freedom Energy, Inc.*, 340 Ark. 74, 8 S.W.3d 511 (2000); and *Texaco, Inc. v. Fox, supra* ).

Alternatively, Appellees argue that, even if *Young* is not consistent with current prevailing authority, the Findley lease must be interpreted in accordance with the prevailing law at

the time the parties entered into the Lease—namely, *Young.* Appellees' Brief at 18 (citing, *inter alia, DePaul v. Kauffman,* 441 Pa. 386, 398, 272 A.2d 500, 506 (1971) ("[T]he laws in force when a contract is entered into become part of the obligation of [the] contract 'with the same effect as if expressly incorporated in its terms.' ")).

As a preliminary matter, we recognize that our decision in *Young* is more than a century old; thus, there is bound to be uncertainty as to how such precedent applies to disputes involving an industry that has changed rapidly over that same time period. As previously noted, while habendum clauses traditionally were used to protect the interests of lessors, *see Swiss Oil,* 67 S.W.2d at 31, the clauses are now viewed as a protection for lessees. Moreover, *Young* left room for interpretation; although *Young* specifies that whether a lease makes a profit is key to determining if it produces in paying quantities, it does not address over what time period such an assessment is to be made. Further, *Young* broadly focuses on the good faith judgment of the operator, but without specifying precisely when the operator's judgment comes into play. The present case allows us to address these open issues.

Jedlicka casts *Young* as prescribing an objective test—a mathematical calculation of profits—which, if the elements are not met, indicates the lease is not producing in paying quantities. She further contends that the good faith judgment of the operator is relevant only where a lease *is* producing in paying quantities—i.e., making a profit—but yet may not offset its total operational expenses. There are two inherent flaws in this argument. First, by its terms, *Young* requires consideration of the operator's good faith judgment *as part* of the assessment of whether the lease produces in paying quantities. *See Young,* 194 Pa. at 250–51, 45 A. at 122–23 ("The phrase 'paying quantities,' therefore, is to be construed with reference to the operator, and by his judgment when exercised in good faith."). Second, Jedlicka's argument overlooks the fact that profits must be measured over some time period, and, as we discuss below, setting a reasonable time period necessarily implicates the operator's good faith judgment. Thus, in as-

sessing whether a lease is producing in paying quantities, *Young* places the principal focus on the good faith judgment of the operator.

Initially, we note that the courts of many of our sister states have concluded that the determination of whether a lease has produced in paying quantities requires consideration of the operator's good faith judgment. Indeed, some of these courts have relied on *Young*.[12] In the landmark case of *Clifton v. Koontz*, the Texas Supreme Court acknowledged the "generally accepted" definition of production "in paying quantities": "If a well pays a profit, even small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable." 160 Tex. 82, 325 S.W.2d 684, 690–91 (1959) (quoting *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509, 511 (1942)).[13] The court, however, continued:

In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit

12. The dissent suggests that our interpretation of *Young* is based, not on its plain language, but on how other courts have interpreted *Young*, and avers, "[w]hile arguably reflecting a more modern view of 'paying quantities,' these cases are in conflict with the plain terms of *Young*, which impose a threshold, marginal profitability requirement." *See* Dissenting Opinion, at 229, 42 A.3d at 280. The dissent further posits that the decisions on which we rely "did not elaborate on the original formulation of the 'paying quantities' test," set forth in *Young*, but rather "effectively displaced that standard where well production was marginal or sporadic." *Id.* at 231, 42 A.3d at 281. The *Young* decision is more than 100 years old, and was decided at a time when habendum clauses were used to protect the interests of lessors, not lessees. *See Swiss Oil, supra.* Often, this Court is called upon to interpret established case law against new facts, which is what we do in the case *sub judice.* Moreover, *Young* failed to address the necessary aspect of the time period over which an assessment of whether a lease has made a profit should be made, and failed to specify at what point an operator's good faith judgment becomes a relevant factor; thus, we merely look to other jurisdictions for guidance in construing language similar to *Young*, and, at times, *Young* itself.

13. We note that this formulation by the Texas Supreme Court in *Clifton* may be traced to this Court's decision in *Young. See Clifton*, 325 S.W.2d at 690–91, quoting *Garcia*, 164 S.W.2d at 511; which in turn quotes *Gypsy Oil Co. v. Marsh*, 121 Okla. 135, 248 P. 329, 333 (1926); which in turn cites, *inter alia, Young*, 45 A. at 121.

and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

In determining paying quantities, in accordance with the above standard, the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his produce, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding the lease merely for speculative purposes.

*Clifton*, 325 S.W.2d at 691.

Thus, to the extent the "profit over operating expenses" test comprised the entire test for determining whether a well produced in paying quantities under *Garcia*, the *Clifton* court held that such test was but one of several elements a court must consider when determining whether a reasonably prudent operator would continue to operate a lease for the purpose of making a profit and not for speculation. Another relevant factor in determining whether a well has produced in paying quantities under the reasonable and prudent operator standard is whether the lessee is holding the lease for the purpose of making a profit, and not merely for speculative purposes. *See Clifton*, 325 S.W.2d at 691. This inquiry necessarily implicates the issue of whether a lessee has exercised his judgment in good faith.

In *Pack v. Santa Fe Minerals*, the Oklahoma Supreme Court likewise held that an operator's good faith is a necessary consideration in determining whether a well has produced in paying quantities. The court, in holding that a failure to market oil or gas did not alone operate to terminate a lease under a "cessation or production" clause, explained:

More recently, in *Stewart v. Amerada Hess Corp.*, 604 P.2d 854 (Okla.1979), we reaffirmed the rule that an oil and gas lease could not be terminated under the habendum clause

merely because the subject well ceased production in paying quantities. Rather, the finder of fact must also look into the circumstances surrounding the cessation, including the "[d]uration and cause of the cessation, as well as the diligence or lack of diligence exercised in the resumption of production." 604 P.2d at 858, fn. 18. In so holding we affirmed our rejection of a literal construction of the habendum clause stating:

"Under a literal or strict interpretation of the 'thereafter' provision in a habendum clause, uninterrupted production—following expiration of primary term—would be indispensable to maintain a lease in force. This would mean, of course, that *any* cessation of production [in the paying-quantities sense of the term], however slight or short, would put an end to the lease. Oklahoma has rejected that literal a view. Our law is firmly settled that the result in each case must depend upon the circumstances that surround cessation. Our view is no doubt influenced in part by the strong policy of our statutory law against forfeiture of estates."

869 P.2d 323, 326–27 (Okla.1994) (alterations and emphasis original). The court concluded "[i]n short, the lease continues in existence so long as the interruption of production in paying quantities does not extend for a period longer than reasonable or justifiable in light of the circumstances involved." *Id.* at 327 (emphasis original).

In *Swiss Oil, supra,* the Supreme Court of Kentucky acknowledged the term "paying quantities":

is usually defined as being such quantities as will pay a profit, but at least the cost of operating the well. The lessee is not required to market the gas at a loss, but only when there is a reasonable profit, and in determining whether it could be so marketed, the distance to the market, the expense of marketing, and every similar circumstance should be taken into consideration. In determining whether or not a gas or oil well is productive to this extent, the judgment of an experienced operator or lessee, *if exercised*

*in good faith,* will prevail as against that of a lessor without experience.

67 S.W.2d at 31 (emphasis added). Thus, although the court in *Swiss Oil* viewed the phrase "paying quantities" as a measure to protect a lessee from his obligation to continue operations under an unprofitable lease, it too found the good faith judgment of the lessee to be a relevant consideration in determining whether a well has produced in paying quantities.

As the above cases reveal, in determining whether a well that has suffered marginal or sporadic production for some period should be deemed to have failed to produce in paying quantities, "a majority of jurisdictions apply a subjective approach and will look to a number of factors and relevant circumstances to determine whether or not a prudent lessee would continue to operate the lease for profit and not for speculation." Richard W. Hemingway, Law of Oil and Gas 320 (3rd ed.1991).[14]

■ Regarding Jedlicka's position that, under *Young,* a determination of whether a well has produced in paying

14. Jedlicka contends, and commentators agree, that Kansas has expressly adopted a purely objective test for determining whether a well has produced in paying quantities, and has held that good faith of the operator is not a factor. Indeed, in *Reese Enterprises, Inc. v. Lawson,* 220 Kan. 300, 553 P.2d 885 (1976), the Kansas Supreme Court, after expressing concern that the subjective approach, which leaves the matter "to the sole judgment of the lessee," does not adequately protect a lessor from "the very real factor that the lessee may be interested in preserving his interest for speculative purposes," explained:

> In our opinion the better approach is to ... apply an objective test, where the determination of 'paying quantities' turns upon a mathematical computation. This approach recognizes the interest of both the lessor and the lessee, and it gives the lessor some protection when the burdens of the lease far exceed the meager royalty payments, when they fall below the customary delay rental.

*Id.* at 897 (citations omitted). The court acknowledged, however, that "application of the objective standard to a determination of whether an oil and gas lease is producting [sic] oil in 'paying quantities' under the 'thereafter' clause of the lease is not free from difficulties." *Id.* The court further stated that its opinion "should not be construed as requiring an eighteen month period of unprofitable operation to terminate an oil and gas lease," but that "[t]he time factor in the formula ... is a question we leave open," thus suggesting that a lease may be terminated based on unprofitable operation over a period of less than eighteen months. *Id.* at 899.

quantities must be based on an objective mathematical calculation of profits,[15] we note that the test for determining in

15. Jedlicka argues that *Young* is consistent with decisions from other jurisdictions that have adopted an objective test for determining whether a well has produced in paying quantities. Appellant's Brief at 17 (citing, *inter alia, Reese Enterprises*, 553 P.2d at 897) (to avoid termination of the lease, a lessee must "produce those quantities of oil or gas which will produce a profit, however small, over operating expenses, after eliminating the initial cost of drilling and equipping the well"); *Sheffield v. Exxon Corp.*, 424 So.2d 1297, 1303 (Ala.1983) ("[p]aying quantities means production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss"); *Landauer, supra* (same); *Kerr v. Hillenberg*, 373 P.2d 66 (Okla.1962) (same); *Blausey v. Stein*, 61 Ohio St.2d 264, 400 N.E.2d 408 (1980) (same); *Ross Explorations, Inc. supra* (same); *Swiss Oil Co., supra* (same); and *Vance v. Hurley*, 215 La. 805, 41 So.2d 724 (1949) (same). However, simply characterizing *Young* as consistent with the law of other jurisdictions in this regard does not make it so.

Furthermore, in several instances, Jedlicka characterizes certain jurisdictions as having expressly adopted an objective test, when, in fact, the decisions cited by Jedlicka do not support her contention. For example, in *Blausey*, and *Vance*, it was not necessary for the courts to consider the good faith of the operator because the question of whether the leases produced in paying quantities was not seriously at issue; the courts determined, as a preliminary matter, that the wells in question had paid a profit. *See Blausey*, 400 N.E.2d at 410 (holding that the trial court erred in including value of appellee's labor in calculating operating expenses, and thus erred in finding the well was not profitable); *Vance*, 41 So.2d at 728 ("It is our opinion ... that the well drilled on the property of the plaintiffs is producing in paying quantities within the meaning and contemplation of the parties as set out in the terms of their contract of lease."). Interestingly, in *Vance*, the Louisiana Supreme Court took note of an apparent lack of good faith by the plaintiff-lessors:

The plaintiffs by their own actions showed they never entertained any doubt but that the well was producing in paying quantities, for the record shows although they were not satisfied with the production of the well, they never voiced any serious complaint with respect thereto, but, instead accepted the monthly royalty payments due thereunder during more than two years and that it was only upon the expiration of the third year, and only after they had failed in their effort to collect from their leases personally under the contemporaneous agreement, that they first entertained the idea of cancelling the lease on this ground.

*Id.* at 727.

In *Ross Explorations*, the Arkansas Supreme Court specifically declined to consider the appellant's assertion that the trial court erred in refusing to apply a "reasonably prudent operator rule" to determine whether a well had produced in paying quantities, noting that the

paying quantities could never be *purely* objective, absent picking an arbitrary time period.[16] Profits must be measured over some time period and establishing what is a reasonable time period warrants consideration of the particular characteristics of a given leasehold. *See Clifton,* 325 S.W.2d at 691 (one factor to be considered in determining paying quantities is "a reasonable period of time under the circumstances"). An operator, exercising his good faith judgment, may be willing to wait longer for one lease to become "profitable" than he is willing to wait for another well to become profitable, and unless it can be established that he is not acting in good faith on his business judgment, but instead is acting with fraudulent or dishonest intent, he does not forfeit his rights under the lease based on a difference in such judgment. *Colgan,* 194 Pa. at 242, 45 A. at 121.

Thus, with regard to what constitutes a reasonable time period by which to determine whether a well is profitable, we decline to establish a definite rule. Although Jedlicka maintains a one-year period of loss is sufficient to conclude that a well has failed to produce in paying quantities, courts have been disinclined to impose such a rigid term. For example, in *Texaco, Inc. v. Fox, supra,* in addressing an argument that a 13–year period was sufficient to determine the profitability of a lease, the court explained:

> it is generally accepted that profitability on an oil and gas lease should be determined over a relatively long period of

argument had not been raised before the trial court and the absence of the trial court's ruling constituted a procedural bar to the court's review. 8 S.W.3d at 516.

Finally, in *Kerr,* the Oklahoma Supreme Court did not apply an objective test for determining whether a well had produced in paying quantities. Indeed, it did not consider the issue of paying quantities, noting that, if the plaintiffs were entitled to prevail, it was "because of the cessation of actual production." 373 P.2d at 69. The court ultimately concluded the temporary cessation in production did not operate to terminate the lease where the lessee made persistent and good faith efforts to repair the mechanical problems that caused the cessation of production.

**16.** Kansas is the only jurisdiction that has seemingly established an arbitrary time period over which to measure profits. *See Reese Enterprises, supra* n. 14.

time in order to expose the operation to the leveling influences of time. The arbitrary use of a short period of time while a well is down for a workover is obviously untenable. On the other hand, the use of an unreasonably long period would entail using past glories during flush production to determine a lease's present condition, which would give a distorted result not reflective of the current status of the lease. The better rule precludes the use of a rigid fixed term for determination of profitability and uses a reasonable time depending upon the circumstances of each case, taking into consideration sufficient time to reflect the current production status of the lease and thus to "provide the information which a prudent operator would take into account in whether to continue or to abandon the operation."

618 P.2d at 848 (citation omitted). Ultimately, the court found the 13–year accounting period unreasonably long, but held such finding was irrelevant in light of its determination on a depreciation issue. *See also Ross Explorations,* 8 S.W.3d at 516 (noting that appropriate period for determining profitability depends "upon the facts of the particular case and the specific reasons production waned or ended," and holding that, "[u]nder the facts of the instant case," a 24–month period was reasonable for determining profitability); *Fisher,* 830 P.2d at 1386 ("[t]he appropriate time period for determining profitability is a time appropriate under all the facts and circumstances of each case.").[17] Ultimately, under *Young,* we conclude that even the determination of what constitutes a "reasonable time period" by which to evaluate whether a well has produced in paying quantities must be based on the unique circumstances of each individual case, and be driven by consideration of the good faith judgment of the operator.

17. Jedlicka also cites *Buehler v. Angle,* 79 P.3d 1093 (Kan.App.2003), for the proposition that nine months is a reasonable period to use in determining paying quantities; however, that decision is unpublished and non-precedential, and, in any event, the court recognized that rigid fixed terms are disfavored, and limited its conclusion to the facts of that case.

 Accordingly, and for the reasons stated above, we hold that, if a well consistently pays a profit, however small, over operating expenses, it will be deemed to have produced in paying quantities. Where, however, production on a well has been marginal or sporadic, such that, over some period, the well's profits do not exceed its operating expenses, a determination of whether the well has produced in paying quantities requires consideration of the operator's good faith judgment in maintaining operation of the well. In assessing whether an operator has exercised his judgment in good faith in this regard, a court must consider the reasonableness of the time period during which the operator has continued his operation of the well in an effort to reestablish the well's profitability.[18]

 Although Jedlicka suggests that, "if only a subjective standard is used to determine paying quantities, oil and gas companies may choose to hold onto otherwise unprofitable wells for merely speculative, as opposed to productive, purposes," Appellant's Brief at 19, we disagree. Under the standard set forth above, a lessor will be protected from such acts because, if the well fails to pay a profit over operating expenses, and the evidence establishes that the lessee was not operating the wells for profit in good faith, the lease will terminate. Consideration of the operator's good faith judgment in determining whether a well has produced in paying quantities, however, also protects a lessee from lessors who,

18. We note that, in cases which expressly provide for consideration of an operator's good faith judgment, some courts have held the good faith judgment of an operator should be considered as a preliminary factor in determining whether a well has produced in paying quantities, *see Clifton*, 325 S.W.2d at 691 ("In determining paying quantities ... the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator."), while others have suggested that a determination that an operator has operated a well in good faith may save a lease from termination following a determination that a well did not produce in paying quantities, *see Pack*, 869 P.2d at 327 ("[T]he lease continues in existence so long as the interruption of production in paying quantities does not extend for a period longer than reasonable or justifiable in light of the circumstances involved."). In Pennsylvania, we find this to be a distinction without a difference. A lease terminates when it ceases to produce in paying quantities, but, as discussed herein, that determination incorporates an operator's good faith judgment.

by exploiting a brief period when a well has not produced a profit, seek to invalidate a lease with the hope of making a more profitable leasing arrangement. In the instant case, for example, Jedlicka seeks to invalidate a nearly 80–year–old lease based on a single-year loss which occurred more than more than 45 years ago, after which the wells resumed and continued production at a profit.

■■■ Turning now to the specific circumstances of the instant case, Jedlicka contends that, because there was a $40 loss in 1959, the subject wells failed to produce in paying quantities, resulting in termination of the lease. The trial court, without expressly finding that a one-year period in the context of a nearly 80–year–old lease was not a "reasonable time period" in which to conclude that the wells were not profitable, determined that "[t]he evidence indicates that the lessees were operating the wells in good faith," and, on this basis, that the wells had produced in paying quantities. *T.W. Phillips Gas and Oil Co. and PC Exploration, Inc.*, No. 10362 CD 2005, at 6. Based on our review of the record, we find no error in this regard.

As explained above, pursuant to *Young*, the operator's good faith judgment is the principal focus in determining whether a lease has produced in paying quantities. Thus, as we have construed *Young*, the trial court properly considered Appellees' good faith judgment in its consideration of whether the wells had produced in paying quantities.

Here, Jedlicka presented no evidence to suggest that Appellees have not operated the wells in good faith. Significantly, as Appellees emphasize, Jedlicka's own expert witness, Wayne Leeper, a petroleum geologist, testified he would have continued to operate the well that had sustained the $40 loss in 1959 because the well "makes money." N.T. Trial, 4/17/07, at 191 (R.R. at 353a). The witness further testified that the other wells on the Jedlicka property, including Well Nos. 6, 7, 8, and 9, are favorably producing. *Id.* at 205–05 (R.R. at 367a–368a). Accordingly, we find the record supports the trial court's conclusion that the lease was being operated in good faith and

that Jedlicka failed to sustain her burden of establishing a lack of good faith by Appellees. *See Jefferson County Gas Co., supra.* As a result, we agree she failed to prove that the wells had not produced in paying quantities. For these reasons, we affirm the order of the Superior Court.

Order affirmed.

Justice ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices BAER and McCAFFERY join the opinion.

Justice EAKIN files a concurring opinion.

Justice SAYLOR files a dissenting opinion.

Justice EAKIN, concurring.

I join the majority in affirming the Superior Court's order. I write separately, however, to expand upon and note my disagreement with portions of the majority's opinion.

Appellant reads *Young v. Forest Oil Co.*, 194 Pa. 243, 45 A. 121 (1899) to require an objective test for determining if a well is producing in "paying quantities." Appellant's vision for this objective test would require a mathematical calculation of the well's profits, such that if during any 12–month period the well sustains a loss, the lease could be terminated. As the majority correctly determines, "the test for determining in paying quantities could never be *purely* objective, absent picking an arbitrary time period." Majority Op., at 222, 42 A.3d at 274–75 (emphasis in original). That is because profitability is not measured (under the lease, much less elsewhere) on a calendar year. If Ford loses a billion dollars one year and makes two billion the next, it has sold cars in "paying quantities." Scouring the 80–year history of a well and finding a 12–month period where expenses were greater than revenue is false accounting for lease purposes and cannot be rewarded.

Regarding the term "paying quantities" in the lease habendum clause, the majority properly characterizes it as either a

shield or a sword, depending on who is wielding it. At the time the lease was written, this clause was used to release the driller from the lease when the well was no longer profitable. The landowner, on the other hand, typically wanted the lease to remain intact so as to obtain rent from an otherwise unprofitable well. Here, it is Appellant who is the party attempting to terminate the relationship, even though she has received payments and gas throughout the life of the lease. Therefore, this is not a case where a driller, desiring to get out of a lease, slows production in bad faith and causes the well to not produce in "paying quantities." Accordingly, I do not believe a review of whether Appellees acted in good faith is necessary for the disposition of this issue. Similarly, I would refrain from discussing *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684 (1959) and its subjective productivity analysis, as it is equally inapposite to this lease; these are questions better left for another day when we are given advocacy on the considerations relevant thereto.

Justice SAYLOR, dissenting.

I differ with the majority's formulation of the "paying quantities" test, as set forth in *Young v. Forest Oil Co.*, 194 Pa. 243, 45 A. 121 (1899). In my view, *Young* provides a two-part, hybrid standard for ascertaining if a well is producing in "paying quantities." The objective and threshold element is that profits must exceed operating expenses, *i.e.*, that the well must be at least marginally profitable. If profits exceed operating expenses, then the subjective component—the lessee's good-faith judgment—comes into play. In those instances, it should be presumed that the lessee is operating the lease in good faith, and unless the lessor rebuts this presumption, the lease is said to be producing in "paying quantities." My reasoning is as follows:

## I. Background

At the outset, this appeal is set amid the backdrop of a contract dispute. Briefly, and as noted by the majority, Appellant's predecessors in title and Appellee T.W. Phillips

Gas and Oil Company executed an oil-and-gas lease in 1928. In relevant part, the lease states that it remains in effect after the primary term so long as "oil or gas is produced in paying quantities, or operations for oil *or* gas are being conducted thereon." Majority Opinion, at 210, 42 A.3d at 264 (emphasis added; citation omitted). Although the lease does not define the phrase "paying quantities," Appellant and Appellees are in agreement that the original parties to the contract incorporated the meaning of the term supplied by the Court's 1899 ruling in *Young*. *See, e.g.*, Brief for Appellant at 11; Brief for Appellees at 12.

Rather than providing a straightforward definition of the phrase, *Young* sets forth a series of principles to determine when a well is producing in "paying quantities." According to the Court, the phrase means paying quantities to the lessee, not the lessor; a "stipulated condition for the termination of the lease" occurs if either "oil has not been found, and the prospects are not such that the lessee is willing to incur the expense of a well (or second or subsequent well as the case may be)" or "oil has been found but no longer pays the expenses of production"; and a well is producing in "paying quantities" if it pays a profit over operating expenses, even if it never repays its "cost," [1] and the operation as a whole results in a loss. *Young*, 194 Pa. at 250, 45 A. at 122–23. The *Young* Court summed up its judicially-crafted (but apparently industry-accepted) definition of the term along these lines: "The phrase, 'paying quantities,' therefore is to be construed with reference to the operator, and by his judgment when exercised in good faith." *Id.* at 251, 45 A. at 123. The Court,

---

1. Most courts and commentators have construed "cost," in this sense, to refer to the expenditures associated with drilling, completing, or equipping the well. *See, e.g.*, OWEN L. ANDERSON ET. AL., HEMINGWAY OIL AND GAS LAW AND TAXATION 253 (4th ed. Thompson West 2004). Operating or "lifting" expenses, in contrast, have generally been understood to include: "labor costs of pumpers and others operating equipment on the lease; day-to-day power and supplies; severance taxes; ad valorem taxes; license and permit fees; replacement and repair of producing equipment, maintenance and repairs of roads, entrances, and gates; and electricity and telephone costs." *Id.* at 258 (footnotes omitted).

however, did not define "good faith" or explain its function for purposes of this inquiry.

## II. Marginal Profitability

The majority initially holds that, under *Young,* operating expenses can exceed profits, and yet, a well can still be producing in "paying quantities." *See* Majority Opinion, at 222–24, 42 A.3d at 276–77. In reaching this conclusion, the majority does not rely on the text of *Young,* but rather, on how other courts have interpreted the phrase, finding the rulings in *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684 (1959), and *Pack v. Santa Fe Minerals,* 869 P.2d 323 (Okla. 1994), particularly instructive on this issue. *See* Majority Opinion, at 216–20, 42 A.3d at 272–74. These decisions, posits the majority, are consistent with *Young,* and thus, inform this Court's judgment as to the issue on appeal. *See id.* at 216–18 & n. 12, 42 A.3d at 272–73 & n. 12.

While arguably reflecting a more modern view of "paying quantities," these cases are in conflict with the plain terms of *Young,* which impose a threshold, marginal profitability re- quirement. *Young* clearly states that, "if oil has been found but no longer pays the expenses of production," a "stipulated condition for the termination of the lease has occurred." *Young,* 194 Pa. at 250, 45 A. at 122. Despite the fact that the Court did not specifically indicate that such a well is not producing in "paying quantities," it is obvious from the context that such failure is the stipulated condition for terminating the lease. *See Barnsdall v. Boley,* 119 F. 191, 198 (C.C.N.D.W.Va.1902) (finding that *Young* expressly held that, "where oil has been found, but no longer pays the expenses of production, that it is not producing in paying quantities").

In this regard, *Young* reflects the prevailing view among courts at that time. Historically, "paying quantities" had to include "an element of profit to the lessee." Anderson, Oil and Gas Law at 252; see Douglas Hale Gross, *Meaning of "Paying Quantities" in Oil and Gas Lease,* 43 A.L.R.3d 8, § 2[a] (1972) ("[T]he requirement that there be a profit is the core around which the meaning of paying quantities is built." (footnote omitted)). The rationale for this rule is perhaps best

summarized by the Texas Supreme Court in *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509 (1942). There, the Court rejected the argument that, if a well produces any amount of oil or gas that is capable of division, it is producing in "paying quantities," opting instead to adopt the approach followed by the majority of courts that, " '[i]f a well pays a profit, even small, over operating expenses, it produces in paying quantities[.]' " *Id.* at 511–12 (quoting *Gypsy Oil Co. v. Marsh,* 121 Okla. 135, 248 P. 329, 334 (1926), in turn, quoting, *inter alia, Young,* 194 Pa. at 250, 45 A. at 122–23).

The *Garcia* Court explained its ruling, in relevant part, as follows:

> The object of the contract was to secure development of the property for the mutual benefit of the parties. It was contemplated that this would be done during the primary period of the contract. So far as the lessees were concerned, the object in providing for a continuation of the lease for an indefinite time after the expiration of the primary period was to allow the lessees to reap the full fruits of the investments made by them in developing the property. Obviously, if the lease could no longer be operated at a profit, there were no fruits for them to reap. The lessors should not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees. Since the lease was no longer yielding a profit to the lessees at the termination of the primary period, the object sought to be accomplished by the continuation thereof had ceased, and the lease had terminated.

*Id.* at 512–13.[2] Thus, as originally conceived and reflected in *Young,* a well had to be marginally profitable to be producing in "paying quantities."

2. One commentator has similarly set forth the reasoning behind the marginal profitability requirement, stating that:

> [R]equiring the value of production to exceed only the operating expenses is another way of saying that the lessee might sustain an overall loss on the leased premises and still maintain the lease in full force. The object of providing for a continuation of the lease for an indefinite time during the secondary term after the expiration of the

Beginning with the decision in *Henry v. Clay*, 274 P.2d 545 (Okla.1954), however, some courts started construing "paying quantities" so that unprofitable wells could achieve this designation. *See* Anderson, Oil and Gas Law at 254–57 & accompanying footnotes. These approaches apparently developed as a response to the difficulties associated with applying the traditional understanding of "paying quantities" to marginal wells—*i.e.*, wells operating at a loss—because that standard did not account for "the problems of cyclical production or the period over which the well should be tested to determine whether production is profitable." *Id.* at 254. Notably, while implementing a more lenient threshold, these tribunals did not elaborate on the original formulation of the "paying quantities" test, as the majority appears to suggest; instead, they effectively displaced that standard where well production was marginal or sporadic.

In *Clay*, for example, the Oklahoma Supreme Court initially recited the traditional definition of "paying quantities," stating that "[i]f the well pays a profit even though small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the operation as a whole may prove unprofitable." *Clay*, 274 P.2d at 546 (citations omitted). The Court then devised a rule in which a lease would not terminate if profits did not surpass lifting expenses, *see id.* at 548,[3] thus supplanting the original understanding of "paying

> primary term is to allow the lessee to reap the full fruits of the investments made by him in developing the property. This objective is met, in regard to the habendum clause, by defining paying quantities so as to allow a lessee who is making a profit over the actual cash which must be expended to produce the lease (and who is thus reaping rather than speculating) to continue operating in order to recover at least some of the expenses of drilling and equipping, although he may never make a profit on the overall operation. Thus the definition serves to minimize loss.
>
> Gross, *Meaning of "Paying Quantities"*, 43 A.L.R.3d 8 at § 4[b] (footnote omitted).

3. *See Clay*, 274 P.2d at 548 ("Having held that the operator is under a duty to continue production if by the exercise of reasonable skill and diligence the well could be made to produce sufficient oil and gas to justify a reasonable and prudent operator in continuing the operation

quantities" in the case of marginal wells.[4]

The Texas Supreme Court subsequently followed suit in *Koontz*. Like the *Clay* Court, the *Koontz* Court began by noting that "[t]he generally accepted definition of 'production in paying quantities' is . . . '[i]f a well pays a profit, even small, over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable.'" *Koontz*, 325 S.W.2d at 690–91 (quoting *Garcia*, 164 S.W.2d at 511). The *Koontz* Court proceeded to create an exception to this rule similar to the one in *Clay*, concluding that:

> In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

*Id.* at 691. In so holding, the Court relegated the *Garcia* test of marginal profitability—the standard patterned after the one in *Young*—to one of the elements a reasonably prudent operator would consider in determining whether to continue to operate the lease. *See* ANDERSON, OIL AND GAS LAW at 256.

Therefore, as illustrated above, neither scheme is consistent with the one outlined in *Young*, since *Young* expressly requires profits to exceed operating expenses for a well to be producing in "paying quantities," *see Young*, 194 Pa. at 250, 45 A. at 122–23, whereas *Clay* and *Koontz* allow for unprofitable wells to attain that designation. *See Clay*, 274 P.2d at 548; *Koontz*, 325 S.W.2d at 691. I thus am unable to support the

thereof, we believe the operator should have the right to continue production under the same circumstances.").

4. In later cases, such as *Pack*, the Oklahoma Supreme Court summarized this principle as follows:

> In short, the lease continues in existence so long as the interruption of production in paying quantities does not extend for a period longer than reasonable or justifiable in light of the circumstances involved. But under *no* circumstances will cessation of production in paying quantities *ipso facto* deprive the lessee of his extended-term estate.

*Pack*, 869 P.2d at 327 (emphasis in original).

majority's assertion that those rulings inform this Court's judgment regarding *Young.* Moreover, by relying on such contradictory authority, it appears that the majority is overruling that decision.

I appreciate that more recent developments in this area of the law, at some point, may warrant this Court's consideration of the continued viability of *Young.* Notably, while initially being at the forefront of this field, this Court's jurisprudence has remained largely stagnant for the last 100 years. *See, e.g.*, Ross H. Pifer, *Drake Meets Marcellus: A Review of Pennsylvania Case Law Upon the Sesquicentennial of the United States Oil and Gas Industry*, 6 TEX. J. OIL GAS & ENERGY J. 47, 48 (2010–11). As such, in comparison to other oil and gas producing states, this Court's caselaw is rather antiquated, and thus, the majority opinion could be read as an attempt to modernize Pennsylvania law.

Nevertheless, in the present case, this Court granted allocatur limited to whether the Superior Court misinterpreted *Young. See T.W. Phillips Gas & Oil Co. v. Jedlicka*, 602 Pa. 154, 978 A.2d 347 (2009) ("Did the Superior Court misapply the decision of this Court in [*Young* ] by holding that Pennsylvania employs a purely subjective test to determine whether an oil or gas lease has produced 'in paying quantities[?]' "). Furthermore, neither party is advocating for this Court to overrule that decision; instead, both contend that *Young* supplies the definition of "paying quantities" for purposes of this contract dispute. *See, e.g.*, Brief for Appellant at 11; Brief for Appellees at 12. Indeed, Appellees maintain that, "even if this Court were to decide that the *Young* test is undesirable in every way and should no longer be the controlling law of Pennsylvania, it would still be the only proper test to apply here because the parties contracted on its basis." Brief for Appellees at 17.

I agree with Appellees' position on this point. The majority's decision, in effect, to overrule *Young* is particularly troublesome, not only on account of its *sua sponte* character, *see generally Danville Area Sch. Dist. v. Danville Area Educ. Ass'n*, 562 Pa. 238, 247, 754 A.2d 1255, 1259 (2000) (explaining

that "[s]ua sponte consideration of issues disturbs the process of orderly judicial decision making"), but also because the parties incorporated *Young's* definition of "paying quantities" into their contract. *See, e.g., Lesko v. Frankford Hosp.–Bucks County*, 609 Pa. 115, 123, 15 A.3d 337, 342 (2011) ("The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties[.]" (citation and quotation marks omitted)).[5]

### III. The Lessee's Good–Faith Judgment

The majority also concludes that the good-faith judgment of the lessee need only be considered where profits do not exceed operating expenses. *See* Majority Opinion, at 222, 42 A.3d at 276. Thus, according to the majority, if profits surpass lifting expenses, a well is producing in "paying quantities." *See id.* Neither position is in agreement with *Young*, however.

First, as explained above, that decision expressly imposes a threshold, marginal profitability requirement. *See Young*, 194 Pa. at 250, 45 A. at 122–23. Consequently, even though the exact meaning of the lessee's good-faith judgment is not apparent from *Young*, it stands to reason that a court must first determine that profits exceed operating expenses before evaluating the lessee's opinion. Stated otherwise, the lessee's good-faith judgment is only assessed once profits have been found to surpass lifting expenses, and therefore, the lessee's opinion, even if held in good faith, cannot save an otherwise unprofitable well, as the majority argues.

Presumably, then, this understanding of "paying quantities" led the original parties to the contract to include the operations provision (*i.e.,* "or operations for oil or gas are being conducted thereon") in the habendum clause of the lease. Since it acts independently of the "paying quantities" phrase-

5. *See generally* 17A AM.JUR.2D *Contracts* § 358 (2011) ("Words and phrases as used in particular contracts are to be interpreted in accordance with the meaning with which they have been invested by the parties. When, at the time of formation, the parties attach the same meaning to a contract term and each party is aware of the other's intended meaning, or has reason to be so aware, the contract is enforceable in accordance with that meaning." (footnote omitted)).

ology, the operations provision appears to provide the lessee with a means to preserve the lease in the event that profits do not exceed operating expenses, that is, where a lease is not producing in "paying quantities." *Cf.* Lisa S. McCalmont, *Vanishing Rights of the Mineral Lessor: The Pack v. Sante Fe Minerals Ruling*, 30 Tulsa L.J. 695, 699 (1995). The flexibility afforded to the operations provision further suggests against the over-liberalization of the term "paying quantities."

Moreover, to the extent that the majority suggests that *Young* embodies a purely objective standard where profits exceed operating expenses, I question the majority's reading of that case, as *Young* makes clear that the lessee's good-faith judgment must be evaluated when ascertaining if a well is producing in "paying quantities." *See Young*, 194 Pa. at 251, 45 A. at 123 ("The phrase, 'paying quantities,' therefore is to be construed with reference to the operator, and *by his judgment when exercised in good faith.*" (emphasis added)). Additionally, while the Court has not revisited that ruling in over a century, a number of other tribunals have applied its reasoning in the interim, concluding that *Young* places a central focus on the good-faith judgment of the lessee.[6]

6. *See, e.g., Manhattan Oil Co. v. Carrell*, 164 Ind. 526, 73 N.E. 1084, 1086–87 (1905) (holding that an operator is not required to drill additional wells merely because the profits from the first or test well exceeded the operating expenses; rather, under those circumstances, "whether or not oil is found in paying quantities [so as to mandate further drilling] is ... exclusively to be determined by the operator, acting in good faith and upon his honest judgment") (citing, *inter alia, Young*, 194 Pa. at 243, 45 A. at 121); *Barbour, Stedman & Co. v. Tompkins*, 81 W.Va. 116, 93 S.E. 1038, 1040 (1917) ("The grantor of a right to explore his land for oil and gas cannot forfeit the lease merely because he thinks the quantity of gas discovered therein was not sufficient to constitute a paying well, where the lessee claims it is such a well and is willing to pay the rent stipulated thereto. It is for [the lessee] to say, when acting in good faith, whether the gas is produced in paying quantities." (citing, among other cases, *Young*, 194 Pa. at 243, 45 A. at 121)); *Tex. Pac. Coal & Oil Co. v. Bruce*, 233 S.W. 535, 538–39 (Tex.Civ.App.1921) ("If the well pays a profit, even small, over operating expenses, it produces in paying quantity, though it may never repay its cost, and the operation as a whole may result in a loss. The phrase 'paying quantities,' therefore, is to be construed with reference to the operator, and by his judgment, when exercised in good faith." (quotation marks omitted; citing, *inter alia, Young*, 194 Pa. at 243, 45 A. at 121)); *Gypsy Oil Co.*, 248 P. at 334 ("If a well pays a profit, even small,

The majority further concludes that the reasonably prudent operator standard "necessarily implicates the issue of whether a lessee has exercised his judgment in good faith." Majority Opinion, at 218, 42 A.3d at 273. In this regard, the majority evidently believes that the lessee's good-faith judgment test is a component of (or perhaps subsumed within) the reasonably prudent operator standard. *See id.* at 224–26, 42 A.3d at 275–77 & n. 18. Although the majority makes no attempt to reconcile the reasonably prudent operator standard at large with *Young*, it nonetheless reasons that, to establish good faith under *Young*, a court must consider "the reasonableness of the time period during which the operator has continued his operation of the well in an effort to reestablish the well's profitability," *id.* at 224, 42 A.3d at 276–77, one of the inquiries traditionally associated with that standard. *See, e.g., Koontz,* 325 S.W.2d at 691.

Preliminarily, it bears noting that the lessee's good-faith judgment test and the reasonably prudent operator standard are two distinct concepts.[7] Chief among their differences is the fact that the former is a subjective test, *see, e.g., Brewster v. Lanyon Zinc Co.,* 140 F. 801, 813–15 (8th Cir.1905), whereas the latter is an objective standard. *See, e.g.,* Jared Hall, *Both Eyes Open or One Eye Closed: Does the Reasonable and Prudent Operator Standard Handicap Mineral Lessees in the Prevention of Drainage,* 7 TEX. TECH ADMIN. L.J. 179, 197

over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable. Ordinarily, the phrase ['paying quantities'] is to be construed with reference to the operator, and by his judgment when exercised in good faith." (citing, among other cases, *Young,* 194 Pa. at 243, 45 A. at 121)).

7. *See, e.g.,* Gross, *Meaning of "Paying Quantities",* 43 A.L.R.3d 8 at §§ 10–11 (distinguishing between the lessee's good-faith judgment test and the reasonably prudent operator standard); Gary B. Conine, *The Prudent Operator Standard: Applications Beyond the Oil and Gas Lease,* 41 NAT. RESOURCES J. 23, 31 (2001) (same); Jacqueline Lang Weaver, *When Express Clauses Bar Implied Covenants, Especially in Natural Gas Marketing Scenarios,* 37 NAT. RESOURCES J. 491, 500 (1997) (same); Bruce M. Kramer, *The Interaction Between the Common Law Implied Covenants to Prevent Drainage and Market and the Federal Oil and Gas Lease,* 15 J. ENERGY NAT RESOURCES & ENVTL. L. 1, 6 (1995) (same); Stuart C. Hollimon & Robert E. Vinson, Jr., *Oil, Gas and Mineral Law,* 46 SMU L.REV. 1591, 1600 (1993) (same).

(2006).[8] Indeed, a number of courts and observers have understood the reasonably prudent operator standard as a rejection of the lessee's good-faith judgment test,[9] since the former does not afford considerable deference to the knowledge and judgment of the lessee, which is the central feature of the latter. *See, e.g.,* Conine, *The Prudent Operator Standard: Applications Beyond the Oil and Gas Lease,* 41 NAT. RESOURCES J. at 32 & n. 32; Gary B. Conine, *Speculation, Prudent Operation, and the Economics of Oil and Gas Law,* 33 WASHBURN L.J. 670, 679 (1994). Therefore, I differ with the majority insofar as it views the lessee's good-faith judgment test and the reasonably prudent operator standard as harmonious approaches.

**8.** Unfortunately, some commentators have referred to the reasonably prudent operator standard as a "subjective approach," *see, e.g.,* ANDERSON, OIL AND GAS LAW at 255, and the majority repeats that language here. *See* Majority Opinion, at 220, 42 A.3d at 274. Couching the reasonably prudent operator standard in such terms, however, is misleading, if not wholly inaccurate, since courts have almost universally viewed that inquiry as an objective one. *See e.g.,* George A. Bibikos & Jeffrey C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States,* 4 TEX. J. OIL, GAS, & ENERGY L. 155, 161–62 (2008–09) ("The great majority of oil and gas jurisdictions apply the prudent-operator standard. . . . The standard is an objective one[.]"). *See generally* Kathleen Cooper Lake, *The Prudent Operator Standard and FERC Authority,* 57 TEX. L.REV. 661, 662 n. 8 (1979) (analogizing the prudent operator standard to the reasonable man standard in tort law).

Even so, it does not appear that these observers intended to depart from the traditional meaning of the reasonably prudent operator standard, that is, as a set of non-exclusive, objective criteria to assess if a marginal well is producing in "paying quantities"; rather, by denoting it as a "subjective approach," it seems that they sought to distinguish it from the test (as manifested in *Young*) where the main focus of a paying-quantities inquiry is whether the well's profits exceeded its operating expenses. *See* ANDERSON, OIL AND GAS LAW at 255 (positing that *Koontz* established a "subjective approach" which "allow[ed] a marginal well to continue a lease *even where it is produced at a loss*" (emphasis added)). As such, I do not view this authority as undermining the common understanding of the reasonably prudent operator standard.

**9.** At least one commentator has posited that *Koontz* provides a ready example of this perspective. *See* Gross, *Meaning of "Paying Quantities",* 43 A.L.R.3d 8 at § 11 (explaining that that ruling did not elaborate on the lessee's good-faith judgment test, but instead, apparently jettisoned it in favor of the reasonably prudent operator standard).

Nor do I agree with the majority that, under *Young*, the lessee's good-faith judgment entails a subjective, as well as an objective, component. *See* Majority Opinion, at 222, 42 A.3d at 275 ("[U]nless it can be established that [the operator] is not acting in good faith on his business judgment, ... he does not forfeit his rights under the lease based on a difference in such judgment"); *id.* at 222–24, 42 A.3d at 276–77 ("In assessing whether an operator has exercised his judgment in good faith ..., a court must consider the reasonableness of the time period during which the operator has continued his operation of the well in an effort to reestablish the well's profitability."). Rather, I believe it involves a purely subjective inquiry, which is consistent with how a companion case construed the term.

As noted by the majority, in *Colgan v. Forest Oil Co.*, 194 Pa. 234, 45 A. 119 (1899), a dispute arose between the lessor and lessee with respect to the former's drilling operations, namely, the lessee's decision to put down wells on the eastern half of the lessor's farm, but not the western half. The lessor filed suit for, *inter alia*, specific performance. The trial court found that the western half of the farm would furnish at least one paying well, and thus, directed the lessee to put down a well in that region.

On appeal, the Court reversed, concluding that there was no evidence to support the trial court's finding. *See id.* at 241–42, 45 A. at 121. In addition, and of particular importance here, the *Colgan* Court held that, absent a showing of bad faith, a court will not interfere with the lessee's business judgment with respect to drilling operations. *See id.* at 242, 45 A. at 121. Specifically, the Court reasoned that:

So long as the lessee is acting in good faith, on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudulently,

with intent to obtain a dishonest advantage over the other party to the contract.

*Id.*

As explained earlier, *Young* did not elaborate on the role of the lessee's good-faith judgment for purposes of its "paying quantities" test, even though the Court held that the lessee's opinion must be considered when performing this inquiry. *See Young,* 194 Pa. at 251, 45 A. at 123. It appears that the Court intended for the term to have a similar meaning in *Young* as it did in *Colgan,* since both decisions were issued on the same day, both involved matters relating to wells producing in "paying quantities," and both discussed the good-faith judgment of the lessee in connection with this finding.

Therefore, when reading *Young* in conjunction with *Colgan,* as some courts have done, *see Manhattan Oil Co.,* 73 N.E. at 1086–87; *Tex. Pac. Coal & Oil Co.,* 233 S.W. at 539; *Warfield Natural Gas Co. v. Allen,* 248 Ky. 646, 59 S.W.2d 534, 537 (1933), it stands to reason that the lessee's good-faith judgment is assessed on purely subjective terms for purposes of *Young's* "paying quantities" test. Under this view, it should be presumed that the lessee is operating the lease in good faith where profits exceed operating expenses. Absent a showing of bad faith on the part of the lessee to rebut the presumption, the lease is deemed to be producing in "paying quantities." *See Young,* 194 Pa. at 250–51, 45 A. at 122–23; *Colgan,* 194 Pa. at 242, 45 A. at 121. While such an interpretation does not supply a strong, independent basis to terminate a lease, given the fact that it allows a lessee to conduct his or her drilling operations up to the limits of bad faith, ostensibly, this is because it acts in concert with the threshold, marginal profitability requirement. In short, *Young's* good-faith inquiry, as explain more fully in *Colgan,* merely acts a final check on the lessee's judgment in those instances where the well's profits have been found to exceed its operating expenses.[10]

10. Perhaps one of the most troubling aspects of the majority opinion is the removal of this check upon a mere finding of marginal profitability. *See* Majority Opinion, at 224, 42 A.3d at 276 ("[I]f a well consistently

The majority, however, is not of the opinion that *Colgan* confirms the meaning of "good faith" under *Young*. Instead, it plumbs the reasonably prudent operator standard to announce a more objective good-faith inquiry. *See* Majority Opinion, at 224, 42 A.3d at 276–77 ("In assessing whether an operator has exercised his judgment in good faith ..., a court must consider the reasonableness of the time period during which the operator has continued his operation of the well in an effort to reestablish the well's profitability."). The many difficulties with this approach include the failure to account for: the stark departure from *Colgan's* subjectivity, manifested in a presumption of good faith in the absence of actual fraud; the need for selective recourse to the prudent-operator factors, since reasonable-time-under-the-circumstances is but one of those factors, *see Koontz*, 325 S.W.2d at 691; and the fundamental disharmony between the reasonably prudent operator standard and the two-part objective/subjective inquiry of *Young* and *Colgan*, as previously discussed.

Further, although there is a rational dispute as to whether, given its cryptic nature, *Young* provides for a two-part, as opposed to a one-part, inquiry (*i.e.*, whether it requires an objective profitability/subjective good-faith analysis or simply a subjective good-faith examination),[11] to my knowledge, no court or commentator has gleaned a reasonably prudent operator standard from the four corners of *Young*. Finally, since assessment over a reasonable time period is necessary to the objectively-based inquiry into marginal profitability required

pays a profit, however small, over operating expenses, it will be deemed to have produced in paying quantities.").

11. *Compare, e.g., Tex. Pac. Coal & Oil Co.*, 233 S.W. at 538–39, *with, e.g., Zeller v. Book*, 1905 WL 1178, at *2 (Ohio Ct.App. Apr. 29, 1905) ("It is presumed of course that he will operate in his own interest, and so long as he is acting in good faith and making an effort to get some production out of the well, he has a right to go forward and decide for himself." (citing *Young*, 194 Pa. at 243, 45 A. at 121)); 2 Summers Oil & Gas § 14:14 & n. 1 (3d. ed.2010) (finding that *Young* is one of the many courts that have expressed the view that whether a well is producing in "paying quantities" "depends solely upon the good-faith judgment of the lessee"); Gross, *Meaning of "Paying Quantities"*, 43 A.L.R.3d 8 at § 10 & n. 12 (same).

under *Young*, it is unclear why it should be overlaid—redundantly—onto the separately stated good-faith inquiry.

Here, the Superior Court panel interpreted *Young* as providing a purely subjective test for ascertaining if a lease is producing in "paying quantities," reasoning, in relevant part, that, "while the lease operated at a loss in 1959, [Appellant] has not established any evidence that [Appellees] acted in bad faith." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 964 A.2d 13, 19 (Pa.Super.2008). Thus, the panel determined that Appellant failed to carry her burden, under *Young*, of demonstrating a lack of good faith on the part of Appellees. *See id.* Given that *Young* delineates a two-part, hybrid test, as outlined above, I would conclude that the Superior Court erred in this regard.

Finally, although I realize it is not squarely implicated in the present case, it is my considered view that Pennsylvania may be well served to move, prospectively, to the reasonably prudent operator standard in situations in which the parties employ the paying quantities rubric without making their intentions clearer on the face of their lease agreements, in recognition of the cyclical nature of the industry. Again, I emphasize that my position here is predicated upon the fact that *Young* was incorporated into the salient 1928 oil-and-gas lease.

### IV. Conclusion

Accordingly, with regard to the limited issue upon which this Court granted allocatur, I would hold that Superior Court erred by concluding that *Young* sets forth a purely subjective test for determining whether an oil or gas lease has produced in "paying quantities." I would thus remand.

In such a remand, the Superior Court might find it appropriate to return the matter to the trial court for additional development. For one, the lease is silent as to the relevant time period to determine if the lease is producing in "paying quantities," and it is not clear from the trial court's opinion what, if any, period it used to perform this analysis. *See T.W. Phillips Gas & Oil Co. v. Jedlicka*, No. 10362 CD 2005, *slip*

*op.* at 5–6, 2007 WL 6913660 (C.P.Indiana, July 16, 2007). The nature of the loss suffered by the lease in 1959 is also not apparent from that decision. *See id.* at 5.

Moreover, the remand would allow the trial court to address a number of other subsidiary issues raised by the parties, including whether an accounting loss taken by the lessee is a part of a "paying quantities" calculation, and whether the lease continued in existence under the operations provision of the habendum clause.